[No. S023000. Aug. 15, 2005.]

THE PEOPLE, Plaintiff and Respondent, v.
DEAN PHILLIP CARTER, Defendant and Appellant.

## Counsel

Phillip H. Cherney, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Carl H. Horst and Jeffrey J. Koch, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**GEORGE, C. J.**—Following the guilt phase of the trial, a San Diego County jury found defendant Dean Phillip Carter guilty of the murder of Janette Cullins. (Pen. Code, § 187, subd. (a).)[1] The jury also found defendant guilty of the burglary of Cullins's inhabited residence (§§ 459, 460) and the robbery of Cullins (§§ 211, 213.5), finding that during the course of the burglary and the robbery, defendant personally inflicted great bodily injury (§ 12022.7). The jury found true the special circumstances that the murder was committed while lying in wait, in the course of a robbery, and in the course of a burglary, and that defendant previously had been convicted of the murders of Susan Knoll, Jillette Mills, and Bonnie Guthrie. (§ 190.2, former subd. (a)(2), (15), (17)(i), (vii), as amended by Prop. 115, § 10, as approved by voters, Primary Elec. (June 5, 1990).)

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

The jury further found defendant guilty of forcible rape (§ 261) and forcible oral copulation (§ 288, subd. (c)) arising out of his attack on Barbara S. on March 25, 1984 (approximately 18 days prior to the murder of Janette Cullins). The jury found defendant guilty of burglary of an inhabited residence (§§ 459, 460) and robbery (§§ 211, 213.5) in connection with the attack on Barbara S. As to each of the crimes committed against Barbara S., the jury found that defendant had used a deadly weapon, a knife. (§§ 12022, subd. (b), 12022.3, subd. (a).)

At the conclusion of the penalty phase, the jury returned a verdict of death. The court sentenced defendant to death for the murder of Janette Cullins, in addition to imposing a consecutive sentence of 21 years 8 months for the crimes committed against Barbara S. This appeal is automatic. (Cal. Const., art. VI, § 11; § 1239, subd. (b).)[2]

We set aside the special circumstance of lying in wait, but otherwise affirm the judgment in its entirety as to both guilt and penalty.

## FACTS

### I. GUILT PHASE EVIDENCE

#### A. The Prosecution's Case

##### 1. Overview

The prosecution's theory of the case was that defendant, spurned by a number of women who had rejected his clumsy, unwanted advances, embarked upon a crime spree that spanned approximately three weeks in the early spring of 1984, and consisted of sexually assaulting, robbing, and fatally strangling various women whom he previously had befriended.

On March 24, 1984, defendant, who was then 28 years of age, telephoned an acquaintance of approximately one month, Cathleen Tiner, who declined his invitation to "run off to Mexico and get married." That evening, he telephoned another acquaintance, Polly Haisha, then 18 years of age, informing her that he would be arriving in San Diego the next day. Haisha, who had declined defendant's invitation to "quit school and come sail to France," and had cancelled several dates with defendant, asked him never to call her again.

---

[2] As explained more fully in *People v. Carter* (2005) 36 Cal.4th 1114, 1135, footnote 5 [32 Cal.Rptr.3d 759, 117 P.3d 476], the Ventura County Superior Court sentenced defendant to a sentence of 56 years for crimes he committed against Jennifer S.

Like Tiner and Haisha, Janette Cullins in the weeks leading up to her death also had spurned defendant's advances.

On March 25, 1984, Susan Loyland, with whom defendant had maintained a sexual relationship, traveled to Mexico without defendant, notwithstanding the circumstance that she previously had made plans to travel with him that day. In the evening, defendant broke into Loyland's San Diego residence, raped at knifepoint Barbara S., Loyland's housemate, and also stole money from Loyland's tip cache. Loyland never heard from defendant again.

On March 27, 1984, defendant, having befriended Jennifer S. in the preceding few days, raped her at knifepoint in her Ventura County apartment. He strangled her to the point at which she lost consciousness, and stole her tip money.

Defendant thereafter traveled north to the San Francisco Bay Area, and on April 1, 1984, encountered Tok Kim at a bar located in Lafayette. They commenced a relationship over the next several days, during which period several witnesses observed them together. Kim's decomposed body was discovered on April 13, 1984. Although the cause of her death could not be determined, strangulation could not be excluded as the cause. Kim's vehicle and various personal items were missing.

Kim's vehicle was discovered several hundred miles away in Los Angeles County, parked in front of the Culver City apartment in which the bodies of Susan Knoll and Jillette Mills were found stacked in a closed bedroom closet on April 12, 1984. Mills had been sexually assaulted, and each victim had died from asphyxia caused by strangulation. Knoll's vehicle was discovered one block from the apartment. Mills's distinctive Datsun 280 ZX automobile, as well as personal items belonging to both victims, were missing.

On April 12, 1984, the body of Bonnie Guthrie was discovered on the bedroom floor of her Culver City apartment. She had been sexually assaulted and died from asphyxia caused by strangulation. Personal items were missing from her apartment. Later that same day, defendant made an unexpected visit to Cathleen Tiner at her residence in San Diego; Tiner and Janette Cullins had met defendant at a San Diego bar in February 1984. Tiner told defendant she was expecting her date for the evening momentarily and could not see him. Defendant departed.

On April 14, 1984, the body of Janette Cullins was found lying in the closed bedroom closet of her San Diego apartment. The cause of her death was asphyxia caused by strangulation. Near the front door, the presence of

wood chips on the floor indicated that someone had broken into her apartment. Cullins had died approximately one to two days earlier. A neighbor had observed that the preceding evening, Jillette Mills's vehicle had been parked in front of Cullins's residence and had departed suddenly and loudly. Cullins's vehicle subsequently was discovered several blocks away. A video-camera at a bank automated teller machine on April 13 recorded a man resembling defendant retrieving money from Cullins's bank account.

On April 17, 1984, an Arizona highway patrol officer observed Mills's vehicle traveling erratically near Ashfork, Arizona. The officer effected a traffic stop and arrested defendant. Inside the vehicle, investigators recovered numerous personal items linking defendant to each one of the deceased women.

In order to explain certain factual differences in the crime scenes at the various residences where the deceased women were found, the prosecution theorized that the reason defendant did not conceal the bodies of Tok Kim or Bonnie Guthrie was that neither victim had a roommate who might discover the body. With respect to the killings of Susan Knoll and Jillette Mills, the prosecution theorized that defendant first murdered Knoll, placing her body in the closet, moved her vehicle to make it appear she was not at home, and then waited until Jillette Mills arrived and murdered her. The prosecution further theorized when defendant broke into Janette Cullins's apartment, murdered her, concealed her body in the closet, and then moved her vehicle, defendant similarly may have intended to kill two women. Cullins's new roommate, Cheri Phinney, whom defendant had met earlier that day, was not yet in possession of an apartment key, however, and did not return to the apartment that evening.

## 2. *The Rape of Barbara S.*

The prosecution presented the testimony of a number of witnesses to establish that on March 25, 1984, defendant raped Barbara S. at the residence she shared with Susan Loyland in the marina area of Bay Park, located in San Diego.[3]

---

[3] Prior to the preliminary hearing in this case, Barbara S. suffered severe strokes, and at the time of trial she was relegated to setting forth her answers to counsel's examination by typing them on a typewriter. The court appointed a court intern as a "neutral interpreter." As Barbara S. typed responses to the questions posed, the intern read them aloud to the jury. The court admonished the jury that Barbara S.'s "physical condition was unrelated to the events of March 25[, 1984]."

Outside the presence of the jury, through the proffered testimony of Barbara S.'s tenant and housemate, Susan Loyland, the defense sought to establish that Barbara S. had been a heavy drinker at the time of the attack. Barbara S. acknowledged having had "two drinks before and during supper, but was not impaired or drunk." The defense noted that in her testimony given

Barbara S. testified that on that date, she performed yard work at her residence for most of the day, ate dinner, then fell asleep while watching *60 Minutes* on television in her bedroom. She awakened to find a man grabbing her and dragging her from her bed. The man held at her throat a "sturdy knife" with a blade about six inches in length. The man repeatedly demanded money and held her while he rummaged through her purse. When he sought more money, Barbara S. directed him to the dresser, where she had $200. That money was missing after the attack.

The man then pushed Barbara S. to her knees and repeatedly told her not to look at him. While he still held the knife, the man forced her to orally copulate him. Barbara S. complied because she was frightened. She recalled that notwithstanding her compliance, the man's penis was "semi-flaccid" and "nothing to write home about."

Shortly thereafter, the man bent Barbara S. over the bed facedown and raped her; the man never attained a full erection, and the incident lasted "maybe a very short time."

The man then "hog-tied" Barbara S.'s hands and feet behind her with her pantyhose, and she heard her car keys being removed from her purse. The man departed, telling Barbara S. that "you shouldn't sleep with the TV on." Thereafter, she heard "[a] motor sound, and he screeched off." She partially freed herself by hobbling to the dishwasher, extracting a knife with her teeth, and using the knife to cut the ligature that bound her feet and hands.

Helen McGirr, a neighbor who was a retired registered nurse, testified that she heard Barbara S.'s cries for help and directed her husband to contact the police, who arrived at the scene approximately 10 minutes later. McGirr found Barbara S. "laying in kind of a curled-up position unclothed at the front door right in the doorway" and noticed that Barbara S.'s hands were "dark blue, almost black" from having been tied up. McGirr was certain Barbara S. was not under the influence of alcohol.

San Diego Police Department Detective Ken Creese testified that in his interview with Barbara S. shortly after the attack, the victim appeared "to be

---

at the preliminary hearing, Barbara S. recalled the number of drinks of "scotch and water" she had consumed prior to the attack as "about three," and that she had started drinking in the late afternoon. Barbara S. denied suffering from alcoholism in March 1984. The trial court disallowed the introduction of the proffered evidence relating to her drinking habits.

upset, shaken, somewhat traumatized," and was unable to identify her assailant.

Susan Loyland testified that she rented a room in Barbara S.'s residence at the time of the attack, and had maintained a sexual relationship with defendant in the weeks immediately prior to the attack. Loyland had discussed traveling with defendant to Rosarito Beach, Mexico, on March 25, 1984, but left without him that morning when she was unable to locate him. Loyland suspected defendant might have been Barbara S.'s assailant, and so informed the police on the night of the attack.[4]

Based upon information supplied by Loyland, police investigators placed defendant's photograph in a photo lineup. Barbara S. was unable to identify the perpetrator from the lineup, but told one detective that the voice of her attacker sounded similar to that of defendant's. She testified that during the attack, she thought she recognized her assailant's voice but could not identify it, and after seeing news reports of defendant's arrest several weeks later, "it came together like a ton of bricks" that the man's voice was defendant's. At trial, Barbara S. identified defendant as the man who had attacked her.

Following the attack, Barbara S. noticed her kitchen and bedroom telephone lines had been cut, and that a window screen in Loyland's room was "bent out at a 45-degree angle." Loyland determined that some tip money was missing from a concealed location near the window. She testified: "nobody would look in the place that I had it . . . you'd have to know that the coins were in there." Defendant occasionally had accompanied her home after work, and had seen her conceal her tip money, usually "between 10 and 20 bucks a night in coins." Loyland never saw or heard from defendant after March 25, 1984.

Barbara S.'s next-door neighbor, Janell Barksdale, testified that approximately 6:00 p.m. on March 25, she observed a man whom she did not recognize walk toward Barbara S.'s residence. The man had dark hair, a moustache, and an olive complexion, and "was attractive . . . nice to look at." Upon learning of the attack upon Barbara S., Barksdale told investigators of

---

[4] Loyland worked as a bartender at The Lost Knight Bar, which she described as "a cocktail lounge, kind of a dive," where she met defendant. She testified that she had been "pretty high [on alcohol, marijuana, and cocaine] most of the time" she spent with defendant, had brought him to her bedroom on several occasions in February and March 1984, and recalled that on at least one occasion, defendant had met the owner of the house, Barbara S. Barbara S. testified to having previously met defendant early one morning: "I saved him from getting the hell beat out of him by [Loyland's] regular boyfriend by waking him up."

having seen a man in the area that evening. Three years later, upon seeing a photograph of defendant in the newspaper, Barksdale contacted investigators to inform them that she recognized the person in the newspaper photograph as the man she had observed. At trial, she identified defendant as the man she saw that night.

### 3. *The Rape of Jennifer S.*

Over defendant's objection, the prosecution commenced its case by presenting, under Evidence Code section 1101, subdivision (b), substantially the same evidence pertaining to the March 29, 1984 attack on Jennifer S. in Ventura, as is summarized in *People v. Carter, supra*, 36 Cal.4th at page 1135.

### 4. *The Death of Tok Kim*

The prosecution introduced evidence pertaining to the Alameda County death of Tok Kim in early April 1984. With two exceptions, the evidence was substantially similar to that summarized in *People v. Carter, supra*, 36 Cal.4th at pages 1128–1129.

The first exception involved the testimony of Eddis Jeffrey, who did not testify in defendant's Los Angles County murder trial. Jeffrey, an apartment maintenance worker at the building in which Kim resided, testified that he saw defendant and Kim arrive at her apartment building on the afternoon of April 9 and leave shortly thereafter in the same vehicle. That was the last time Jeffrey saw Kim. Jeffrey acknowledged that prior to trial, he had identified in a police photo lineup prior to trial an individual other than defendant as the person he had seen with Kim.

The second exception involved the testimony of Dr. Byron Blackbourne, a forensic pathologist employed by the San Diego County Medical Examiner. Over defendant's objection, Dr. Blackbourne stated that after reviewing the Kim autopsy and crime scene photographs, he believed that her death possibly could have been caused by asphyxiation due to ligature strangulation.

### 5. *The Fatal Strangulations of Susan Knoll and Jillette Mills*

The prosecution introduced evidence pertaining to the fatal strangulations on or about April 10–11, 1984, of roommates Susan Knoll and Jillette Mills in Los Angeles County. The evidence was substantially similar to that summarized in *People v. Carter, supra*, 36 Cal.4th at pages 1130–1131.

### 6. *The Fatal Strangulation of Bonnie Guthrie*

The prosecution introduced evidence pertaining to the fatal strangulation on or about April 11, 1984, of Bonnie Guthrie in Los Angeles County. The evidence was substantially similar to that summarized in *People v. Carter, supra*, 36 Cal.4th at pages 1131–1132.

### 7. *The Fatal Strangulation of Janette Cullins*

The prosecution presented evidence, summarized below, establishing that defendant and Janette Cullins had been casually acquainted during the several weeks preceding Cullins's death on April 12 or 13, 1984, and that defendant fatally strangled her.

#### a. *Cullins's acquaintance with defendant in early 1984*

On Saturday evening, February 25, 1984, Janette Cullins and a friend, Cathleen Tiner, went to Jose Murphy's, a Pacific Beach nightclub that was featuring Cullins's and Tiner's favorite band. The band stopped playing at 1:30 a.m. (February 26), and the women walked across the street to the Old Pacific Beach Café. They were hungry and knew the café served breakfast until 3:00 a.m.

Cathleen Tiner testified: "When we got into the restaurant there was still a real good crowd, so we decided, let's have a drink, let's go over to the bar and see if we can get a drink before we go over to breakfast. . . . [¶] [However, t]here was a very large crowd there. We were getting bumped around a lot. We could not get to the bar at all. We were far away from it. . . . [¶] Mr. Carter came up to us and, at that time, we didn't know his name, and . . . said my friend's at the bar, would you like me to order some drinks for you? [¶] We said yes, and he said what would you like? [¶] We said two Harvey Wallbangers. [¶] And so he yelled at this friend who was standing over to the bar, ['] hey Antoine [whose last name was Masure], two Harvey Wallbangers.['] "

Tiner added: "Very shortly thereafter, [defendant's] friend came through the crowd with our drinks and with their drinks. I offered to pay for the drinks. I kept trying to pay for them. [¶] [Masure] kept saying no, no, no. [¶] . . . I kept insisting on paying for the drinks. He wouldn't take the money. . . . [¶] [Masure] just took our drinks and walked over to a table and sat them down on a table, and we ended up sitting down with them. . . . [¶] We talked briefly. Dean asked Janette—I heard Dean ask Janette for her phone number." Tiner testified that Cullins eventually gave defendant her

telephone number, and that defendant asked the two women whether they had roommates or lived alone. Tiner gave Masure a card with her own telephone number on it.

Tiner further testified that defendant and Masure wanted the women to accompany them "someplace else," but the men did not provide a further description. The women declined: "Well, we said the right way for you to do it would be to call us and ask us out rather than try for us to go out with you now. [¶] Antoine said we'll go into the twin phone booths and you stand in the other and we'll call you. Then everything will be okay. [¶] We didn't agree with that idea, so Dean Carter said how about dinner. . . . [¶] I said when. He said Antoine's a great cook, how about dinner. I said when, and they said we'll call you. . . . [¶] We left shortly thereafter. I would say we were there less than an hour. . . . [¶] Mr. Carter said we'll walk you to your car because we don't want anyone to get you, or attack you in the parking lot. So they walked us to my car and we drove off."

A few days later, defendant and Masure invited the women to have dinner with them on March 2, 1984, on their "yacht" named the Sea Quest, which was docked near Harbor Drive.[5] The four had dinner on the vessel without incident, with the exception that Cullins's vehicle did not start immediately when the women departed that evening. Defendant and Masure, together with a third party who arrived with cables, assisted the women in "jump-starting" the vehicle. On the way home, Tiner and Cullins discussed the evening. Tiner related Masure's observation that he thought Cullins had not been ready to leave and wanted to stay with defendant. Cullins replied: "No way. I had no intentions of spending the night with him, and if he ever calls me again, I will tell him that."

Two days later, on March 4, defendant telephoned Tiner, informing her that he had spent the day sightseeing with Cullins, and wanted to know whether Tiner "wanted to go out and do something with him that night." Tiner declined.

Defendant telephoned Tiner again on March 24, 1984, indicating that he wanted to see Cullins "one time before he went back to Alaska." Tiner falsely informed defendant that she was unaware of Cullins's whereabouts. "He said to me, why don't I come down there and we can run off to Mexico and get married." Tiner declined that offer, as well as defendant's invitation to go out with him on the following evening.[6]

---

[5] At a foundational hearing conducted outside the jury's presence, Tiner testified that the Sea Quest was neither a yacht, nor a sailboat, but actually a metal vessel that she characterized as rusty, greasy, and cluttered—a platform for large cranes, littered with junk all over the deck—not a pleasure boat that one would use for sailing on the bay.

[6] March 25, 1984, was the date on which defendant attacked Barbara S. (See *ante*, at pp. 1223–1225.)

Tiner then telephoned Cullins to inform her that defendant was looking for her. Cullins replied: "I thought I'd gotten rid of him. Now I won't be able to answer the phone." Tiner further testified: "[Cullins] was angry. She was upset about it that he was calling again." Nancy McEachern, Cullins's former roommate, testified that when she had shared an apartment with Cullins and the telephone rang, Cullins on multiple occasions had informed her: "If that's Dean, I don't want to talk to him."[7]

> b. *The events leading to the discovery of Janette Cullins's body*

Janette Cullins resided in apartment B, located at 3972 Kendall Street in the Pacific Beach neighborhood of San Diego. In search of a new roommate, Cullins placed an advertisement in The Reader, a local free newspaper. Cheri Phinney responded to the ad and began moving into the apartment during the second week of April 1984.

On Thursday, April 12, 1984, Phinney and Cullins spent the day at the apartment. Phinney painted her new bedroom and bathroom, while Cullins kept her company, vacuumed the carpet, and performed other housekeeping chores. Approximately midafternoon, Cullins responded to a knock at her door. The visitor was defendant, and Cullins returned to Phinney, asking her "to come through the living room so that he [defendant] would be aware that there was someone else in the house." Defendant stayed for approximately one hour, asking questions such as how long she planned to continue painting. Shortly thereafter Cullins informed Phinney that defendant had departed.[8]

At approximately 6:30 p.m., Cullins left the apartment, informing Phinney that Cullins was planning to attend the symphony with her friend, Cathleen Tiner.[9] Shortly thereafter, Phinney answered a telephone call and wrote down a message on a piece of paper. The paper was whole when Phinney wrote the

---

[7] Nancy's McEachern's testimony on this point was illuminated by Tiner's testimony that one reason Jeanette Cullins was not interested in becoming involved with defendant was that "he was a drug user" and Cullins was "completely antidrug."

[8] David Susi testified that at approximately 4:00 p.m., on April 12, 1984, defendant, driving a vehicle with the license plate "PHANTM Z," pulled up next to Susi's vehicle at an intersection in Pacific Beach and asked for directions to Mission Beach. Subsequently shown a police photo lineup, Susi selected defendant's photograph as depicting the man whom he saw driving the car, stating, "I think that's him, but I can't be sure." Susi acknowledged on cross-examination that during an interview with investigators conducted on June 1, 1984, Susi recalled that the date on which he saw the vehicle was either April 11 or 12, 1984.

[9] There is a discrepancy in the testimony pertaining to the precise time that Cullins departed from the apartment. Phinney fixed the time of Cullins's departure at approximately 6:30 p.m. Tiner testified that Cullins arrived at Tiner's apartment, an approximate 20-minute drive from Cullins's residence, at 6:10 p.m. The discrepancy does not appear to have any significance.

message, and she left blank the top portion of the paper. When Phinney left the apartment at approximately 7:15 p.m., the drapes and blinds were open. As she locked the door upon leaving, Phinney did not notice any damage to the front door frame.

Cathleen Tiner testified that after she and Cullins attended the symphony, the two women went to a restaurant and then returned to Tiner's apartment, where they watched television until 11:00 p.m. Cullins informed Tiner that defendant was back in town. After watching television with Tiner, Cullins left to return to her own apartment. Tiner never saw Cullins alive again.

Leanne Johnson, who resided across the street from Cullins's apartment, testified that at approximately 11:15 p.m. on April 12, she heard the engine of a vehicle running for about 10 minutes. Johnson peered through her drapes and observed a white vehicle that she identified as matching the white Datsun 280 ZX that defendant was driving when later arrested. Johnson testified: "It was probably 11:30 just before the news went off that I heard the car move out of the parking space and make a U-turn and it almost hit a pickup truck at the house next to mine. [¶] It just went up the street. It didn't stop at the stop sign . . . . [¶] . . . I mean whoever was in the car sort of pulled out fast, and it was a big loud noise and I did look out and I did see him make a U-turn and almost hit the pickup truck."

Throughout the next day, Cheri Phinney attempted to contact Cullins without success. Nancy McEachern testified that on April 13, she was unsuccessful several times in attempting to contact Cullins by telephone. Cullins's telephone answering machine, which usually was switched on, was not activated. Concerned, McEachern drove to Cullins's apartment around midday. When she arrived, "another car pulled up on the opposite side of the street from me, and a man got out of the car and asked me if Jan was home. . . . [¶] I said no, it doesn't look like she's home, her car is not here, I assume she's not. This person had identified himself as Dean. . . . [¶] He was driving a white [Datsun] Z with a black bra on the front of the car." McEachern identified the individual who spoke with her as defendant.

McEachern had moved out of the apartment on April 6, but had retained a key in order to return on the morning of April 14 for the purpose of conducting a yard sale. McEachern entered the apartment (alone), stayed less than 15 minutes, left a message for Cullins, and departed. McEachern testified: "The apartment was closed up. Everything was pretty dark. The blinds were drawn, were closed very tightly, and all the windows, especially

the window in the kitchen, which is a place we never close them in [*sic*]." McEachern explained that the living room drapes also were drawn, an unusual circumstance, adding that when she and Cullins shared the apartment, they never adjusted the window coverings to their completely closed position. Although McEachern entered Cullins's bedroom, the closet doors were shut, and she did not look inside the closet.

Shortly after 6:00 p.m. on the evening of April 13, as Cathleen Tiner was preparing to attend a San Diego Padres baseball game with a friend, defendant arrived unexpectedly at Tiner's front door, "better groomed than I had ever seen him before." He wore a beige sweater with a brown window-pane check.[10] Tiner testified: "I was very surprised. . . . [¶] I said Dean, I'm sorry I can't invite you in. I have company coming over. You should have called. . . . [¶] And he said ['][W]ell, I was here in the neighborhood, I just thought I'd stop by.['] [. . .] He said, [']Did Jan [Cullins] tell you I was in town?['] [¶] And I said yes, she did. [¶] And he said, [']I told her not to tell you that.['] [¶] I said, well, she did. I'm sorry I can't invite you in. You have to leave. I have . . . company coming over. I have to go. [¶] And then [defendant] put his chin up like this, and said, [']Do you know she stood me up today?['] [¶] I said, no, I didn't." Tiner shut the door, unsuccessfully attempted to reach Cullins by telephone, and then attended the baseball game.

On the morning of April 14, Cheri Phinney again attempted to contact Cullins, and Nancy McEachern answered the telephone. McEachern informed Phinney that Cullins was not at home. Phinney drove to the apartment, arriving about 8:30 a.m. McEachern was there with her fiancé. The drapes and curtains were closed. Phinney noticed wood chips on the floor by the front door.[11]

Because Phinney and McEachern had expected Cullins to be at the apartment, they began to search for a note from her, or a document with her license plate number in the event they needed that information to ascertain from local authorities whether Cullins had been involved in a traffic accident. In the course of searching for this information, McEachern opened a bedroom closet door and discovered the partially clothed body of Janette Cullins, lying on some boxes. McEachern's fiancé contacted the police.

---

[10] The sweater had been knitted by murder victim Bonnie Guthrie, whom defendant had fatally strangled two days earlier.

[11] On cross-examination, the defense partially impeached Phinney insofar as having seen wood chips by the front door on the morning that Cullins's body was discovered. Phinney acknowledged she had not recalled seeing the wood chips until police mentioned this detail during one of their interviews with her several months later. On redirect examination, Phinney testified that she told investigators on April 14 that when she departed from the apartment two days earlier, she had not noticed any damage to the doorjamb.

c. *The police investigation*

Richard Thwing, a San Diego police officer assigned to the police department's homicide division, testified that the front door of Janette Cullins's apartment displayed signs that a forced entry had been made. Cullins's body was lying in the bedroom closet. Her neck bore what appeared to be a ligature mark.

Adolph Romero III testified that on the morning of April 14, 1984, as he was walking to work near the Point Loma piers by North Harbor Drive in San Diego, he retrieved a wallet he noticed in some bushes near the sidewalk. The wallet contained a driver's license and other identification items and credit cards in the name of Janette Cullins. Cullins's father later identified the wallet as having belonged to her. Because Romero had an important appointment that morning, he gave the wallet to a friend, Robert Pack, who gave the wallet to the police. During the same week that Romero found the wallet, he also had seen parked within one block of that location a white Datsun 280 ZX.

Dannis Nuckolls, who worked as a San Diego Police Department evidence technician in April 1984, testified that in conducting an inventory of the contents of Cullins's wallet, he found a driver's license and various identification cards, all in the name of Bonnie Guthrie. On April 14, 1984, San Diego police officers recovered Guthrie's purse from the same North Harbor Drive area.

Hormez Guard, a forensic pathologist, performed an autopsy on Janette Cullins at 9:00 a.m. on April 15, 1984. Dr. Guard testified that the cause of Cullins's death was asphyxia due to ligature strangulation, adding that he found evidence the victim had suffered "a sharply cutting incised wound" inflicted "after death, or . . . when the person was dying," consistent with the use of a sharp knife. There was no evidence of sexual assault. On cross-examination, Dr. Guard stated that the time of Cullins's death was between 24 and 48 hours prior to the time that he performed the autopsy.

George Cullins, Janette's father, testified that he had purchased a Triumph TR 7 for Janette in 1980 or 1981. At the time of purchase, the vehicle bore a personalized license plate that read "SHYLAS," which she ultimately replaced.[12]

Susan Seminoff, a friend of Cullins's, testified that in December 1980 she and Janette went together to open checking accounts at San Diego Federal

---

[12] On April 14, 1984, Janette Cullins's father noticed her car parked about one and one-half blocks from her apartment. She usually parked her vehicle directly in front of her apartment.

Bank, which subsequently changed its name to Great American Bank (and later, after Cullins's murder, to Wells Fargo Bank). Seminoff recalled that in selecting an automatic teller machine (ATM) card password, Cullins picked the word from her license plate, "SHYLAS." The word "SHYLAS" was written on the back of a torn Alpha Beta Supermarket receipt recovered by investigators from the "Members Only" brand jacket found in the Datsun 280 ZX that defendant was driving when he was arrested.

Sandra Homewood, an examiner of questioned documents employed by the San Diego County District Attorney's Office, testified that in comparing exemplars of defendant's handwriting with entries found in his address book, Homewood discerned several "unique and conspicuous characteristics" and made a "positive identification" that defendant had written in his address book the names Susan Loyland (rape victim Barbara S.'s tenant, see, *ante*, at pp. 1223–1226), Janette Cullins, Cathleen Tiner, and Susan Knoll. With regard to the slip of paper that read "SHYLAS," Homewood was unable to eliminate defendant or identify him as the writer. In comparing the note to an exemplar of Janette Cullins's handwriting, Homewood indicated there existed "very strong indications" that Cullins had written it.

Great American Bank records revealed that on April 13, 1984, a withdrawal from Janette Cullins's account in the amount of $60.00 (leaving an account balance of $4.06) was made from an ATM located at the bank's Point Loma branch. A four-minute videotape of the transaction was introduced into evidence and shown to the jury. The tape depicted a man wearing a sweater (identified as having been knitted by Bonnie Guthrie) and a black jacket.

### 8. *Defendant's Arrest*

The prosecution introduced evidence pertaining to defendant's April 17, 1984 arrest in Arizona that was substantially similar to that summarized in *People v. Carter, supra*, 36 Cal.4th at pages 1133–1134, with one noteworthy addition, as follows. In the trial conducted in the present case, the prosecution introduced the testimony of Jerald McKeand, a deputy sheriff employed by Yavapai County, Arizona, who recalled that at the time of defendant's arrest, defendant wore cutoff jeans, a gray sweatshirt, tennis shoes, and green socks. Defendant also wore a gold necklace that had belonged to Tok Kim and a workout shirt that had belonged to Jillette Mills.

### 9. *The Contents of the Datsun 280 ZX*

The prosecution introduced evidence pertaining to the contents of the Datsun 280 ZX that defendant was driving when he was stopped and arrested

in Arizona. The evidence was substantially similar to that summarized in *People v. Carter, supra*, 36 Cal.4th at pages 1134–1135.

### B. *The Defense Case*

Outside the presence of the jury, the trial court informed defendant that he had the right either to testify or not to testify. Defendant replied that he was not going to testify.

Unlike defendant's trial in Los Angeles County, in which the defense did not present any evidence at the guilt phase (see *People v. Carter, supra*, 36 Cal.4th at p. 1135), the defense at this trial introduced the testimony of witnesses pertaining to the Los Angles County murders of Susan Knoll, Jillette Mills, and Bonnie Guthrie, the San Diego County murder of Janette Cullins, and the San Diego rape of Barbara S.

### 1. *The Los Angeles County Murders*

The defense introduced the testimony of Ronald C. Tulio, an employee of the United States Postal Service, who had been Susan Knoll's boyfriend and also was acquainted with Knoll's roommate, Jillette Mills, and their friend, Bonnie Guthrie. Tulio testified that he and Knoll had lived together from July 1983 to February 1984, after which Knoll moved in with Mills. In the immediate aftermath of the Los Angeles County murders, members of the Culver City Police Department interviewed Tulio.

On cross-examination, Tulio acknowledged that his breakup with Knoll had been an emotional one, and that on the afternoon of April 12, 1984, Culver City Police Department officers investigating the Los Angeles County murders arrested him and detained him at the Culver City jail for four days. On the night of April 12, 1984, when Janette Cullins was murdered in San Diego County, Tulio was in police custody.

When asked on cross-examination what defense counsel had told Tulio he (Tulio) might testify about, Tulio recalled counsel stating: "He [defense counsel] said all he wanted to do was have me say that obviously the Culver City Police Department made a mistake in arresting me, saying that San Diego [Police Department] could make the same mistake arresting the wrong guy."

Culver City Police Officer Craig Bloor testified that at the time of the Los Angeles County murders, he resided in an apartment building adjacent to the building in which the bodies of Susan Knoll and Jillette Mills were discovered. April 10, 1984, at approximately 8:30 p.m., Officer Bloor noticed

someone he did not recognize walking from the next-door apartments to the street. Upon learning several days later of the double homicide that had occurred in the adjacent building, Officer Bloor identified a photograph of Ronald Tulio as depicting the man he saw on April 10.

On cross-examination, however, Officer Bloor testified that when he observed Tulio at the police station, he recognized some similarities to the person he saw on April 10 but also noticed several differences, and concluded Tulio was not the man he had seen on that date. Instead, Officer Bloor identified defendant in court as the man he noticed on April 10, adding that the man was wearing a " 'Members Only' style cut jacket that was popular then."

On cross-examination, Officer Bloor acknowledged having spoken with defendant on April 10: "I asked him what he was doing in the area, and he said he was looking for a friend's house . . . . [¶] . . . [¶] Then he says[,] '[W]hy, do I look suspicious[?]' [¶] I said yeah, you could. Then he said[, ']It's good that you check.['] Then he left." Defendant held "some kind of blue folder or something like that" that Officer Bloor recalled was "very similar" to a blue folder the prosecution previously had introduced into evidence. The folder, which contained a photograph of defendant, was among the items that investigators recovered from Jillette Mills's Datsun 280 ZX.

### 2. *The Murder of Janette Cullins*

The defense presented the testimony of Michael T. Palermo, who in 1984 was employed as a San Diego Police Department latent print examiner. Palermo testified that as part of the Cullins murder investigation, he examined latent fingerprint impressions recovered from Cullins's apartment, but none matched defendant's.

The defense also presented the testimony of William W. Loznycky, Jr., who in 1984 worked as a San Diego Police Department criminalist. Loznycky testified that neither fibers found on the hand of Janette Cullins, nor head or pubic hairs recovered from a blanket and sheets found in her residence, could be matched to defendant or his clothing. On cross-examination, Loznycky testified that he also examined an "O-type" bloodstain taken from the crime scene that did not match the victim's blood, but could have been left by defendant, whom Loznycky characterized as having an "O" blood type.

Finally, the defense presented the testimony of Lauren Carville, who resided in the apartment one floor below the one occupied by Cullins. Carville testified that she and Cullins had sunbathed in their shared backyard during the afternoon of April 12, during which time an acquaintance of

Cullins visited with Cullins for about 15 minutes. Carville saw Cullins depart in her vehicle that evening at approximately 7:00 p.m., after which Carville went out. Returning at approximately midnight, Carville noticed that Cullins's vehicle was not parked in front of their apartment building, where Cullins normally parked her car.

### 3. *The Rape of Barbara S.*

The defense presented the testimony of San Diego Police Department Officer Gene Loucks, who interviewed Barbara S. shortly after she was attacked. Officer Loucks testified that Barbara S. was unable to recall several physical attributes of her assailant.

## II. *PENALTY PHASE EVIDENCE*

### A. *The Prosecution's Case*

The prosecution introduced into evidence the abstracts of judgment from defendant's prior burglary convictions in Oregon and Alaska and, over defendant's objection, his prior rape conviction in Ventura County. (See *People v. Carter, supra*, 36 Cal.4th at pp. 1135–1136.)

The prosecution also introduced evidence that a deputy sheriff discovered in defendant's San Diego County jail cell a homemade knife or "shank" wrapped in masking tape, as well as a 22-inch pipe. San Diego Police Department Sergeant Carlos Chacon testified over defendant's objection that weapons such as those seized from defendant's cell could have been smuggled into the jail in parts and assembled, and that the shank found in defendant's cell was designed as an offensive weapon to inflict serious bodily injury.

### B. *The Defense Case*

The defense introduced extensive evidence pertaining to defendant's difficult childhood and upbringing in Alaska (defendant is part Eskimo), as well as evidence that he was an accomplished and cooperative television cameraman and a good father and friend. The evidence was substantially similar to that summarized in *People v. Carter, supra*, 36 Cal.4th at pages 1136–1137.[13]

---

[13] In their brief, the People observe that certain passages set forth in defendant's summary of the mitigation evidence contained in the appellant's opening brief were proffered but were not presented to the jury. The People contend the proffered testimony is irrelevant and should be stricken from the brief pursuant to Code of Civil Procedure section 436. The point is a minor one, and in fact the brief observes, albeit indirectly, that the evidence was not presented to the jury. We therefore deny the People's request.

## DISCUSSION

### I. *PRETRIAL ISSUES*

#### A. *Double Jeopardy and Multiple Punishment*

Several weeks prior to the commencement of jury selection, defendant filed motions to dismiss the proceedings against him on the grounds of double jeopardy, collateral estoppel, and the statutory prohibition against multiple punishments. In the alternative, defendant moved "to sever the trial of the issues raised by his pleas of once in jeopardy and former conviction . . . from the trial of his guilt or innocence of the crimes charged in the information." Defendant asserted that he previously had been placed in jeopardy in the Los Angeles County proceedings, and that during those proceedings the jury heard and considered both evidence and argument suggesting defendant was responsible for the murder of Janette Cullins. Having been sentenced to death in those proceedings, defendant sought, on state and federal constitutional grounds, the dismissal of the San Diego County charge that he murdered Cullins.

The trial court denied defendant's motions, stating, among its reasons: "A legal analysis based on the statutes, case law and facts of this case as presented to the court for purposes of these motions shows there is no legal basis for a finding by the court of once in jeopardy. . . . [¶] The double jeopardy argument is meritless under the law and this fact situation, and therefore, the motion to dismiss would be denied. [¶] . . . [¶] This motion is so meritless that in all honesty I don't see how anyone could call it incompetence of counsel not to enter the double jeopardy plea at the arraignment. [¶] . . . [¶] . . . I'm not going to allow the plea. I can't do that because in my discretion there's no legal basis for it."

██ On appeal, defendant reiterates the contentions he made in the trial court. As we shall explain, defendant's position is procedurally barred by his own successful motion in the Los Angeles County proceedings to dismiss the Cullins murder charge. (See *People v. Carter, supra,* 36 Cal.4th at pp. 1158–1159.) Even were we to ignore that procedural flaw, the trial court correctly determined that neither double jeopardy, nor collateral estoppel, nor section 654 considerations barred the San Diego proceedings, and therefore properly rejected defendant's motions.[14]

---

[14] As we noted in another case: "With regard both to this claim and to every other claim raised in his brief, defendant asserts that each alleged error violates not only state law but multiple provisions of the federal and California Constitutions. In addressing each claim discussed in this opinion, we have considered defendant's contention that the alleged error violates the federal and California Constitutions, and our rejection of each claim of reversible

### 1. *The Procedural Bar Based upon Defendant's Successful Motion in the Los Angeles Proceedings to Sever the San Diego Charges*

As we have explained in the companion appeal, *People v. Carter, supra,* 36 Cal.4th at page 1158, "the complaint against defendant charged all of the crimes allegedly committed in Alameda, Los Angeles, and San Diego Counties in a single pleading. Defendant subsequently moved to dismiss the charges arising from the Alameda and San Diego crimes committed against Tok Kim and Janette Cullins, respectively. The prosecution did not oppose the motion, instead informing defendant that if the motion were granted, the crimes committed in Alameda and San Diego Counties would form the basis for a refiling of the charges against defendant in those counties." The trial court in Los Angeles County thereafter granted defendant's motion to dismiss the charges involving the crimes committed in Alameda and San Diego Counties.

Because defendant previously sought and obtained in Los Angeles County the dismissal of the San Diego charges, knowing that the dismissal would compel the San Diego County prosecutor to file separate charges in that county for the crimes defendant was alleged to have committed in that jurisdiction, defendant's contention that proceeding with the San Diego County prosecution was fundamentally unfair or violative of his rights under the state and federal Constitutions is not well taken or worthy of extensive discussion. In view of the evidence linking defendant to the murder of Janette Cullins, San Diego County was entitled to prosecute defendant for that crime (as well as other crimes alleged to have been committed by defendant within that jurisdiction). (§§ 777, 790;[15] *People v. Carpenter, supra,* 21 Cal.4th at pp. 1038–1039; *People v. Bradford* (1976) 17 Cal.3d 8, 15 [130 Cal.Rptr. 129, 549 P.2d 1225].) Having moved in Los Angeles County for dismissal of the charges involving crimes committed in San Diego, notwithstanding the prosecutor's representation that the motion, if granted, would effect a *severance* of the charges against defendant and a refiling in the respective counties in which the crimes occurred, defendant cannot now complain that severance led to a second murder prosecution.

---

error includes a determination that the alleged error does not warrant reversal under the state or federal Constitution." (*People v. Slaughter* (2002) 27 Cal.4th 1187, 1199, fn. 2 [120 Cal.Rptr.2d 477, 47 P.3d 262].)

[15] Several years after defendant's trials, section 790 was amended to permit in certain circumstances the joint trial of murders committed in different counties. (See now § 790, subd. (b), as amended by Stats. 1998, ch. 549, § 1; *People v. Carpenter* (1999) 21 Cal.4th 1016, 1039, fn. 4 [90 Cal.Rptr.2d 607, 988 P.2d 531].) These statutory revisions are not material to our analysis.

## 2. Defendant's Jeopardy, Section 654, and Collateral Estoppel Claims

Even if we were to assume that these claims are not barred, we would conclude that defendant's contentions based upon double jeopardy principles, section 654, and collateral estoppel, lack merit.

### a. Double jeopardy

The state and federal Constitutions declare that no person shall twice be placed in jeopardy for the same offense. (U.S. Const., 5th Amend.; Cal. Const., art. I, § 15.) In Los Angeles County, defendant was placed in jeopardy for the murders of Susan Knoll, Jillette Mills, and Bonnie Guthrie. In those proceedings, he was neither charged with, nor convicted of, any crimes pertaining to the murder of Janette Cullins or the rape of Barbara S. Accordingly, jeopardy never attached to defendant in the Los Angeles County proceedings for the crimes committed in San Diego County. (See *People v. Carpenter, supra*, 21 Cal.4th at p. 1039, fn. 4. [" ' "[T]he murder of two persons, even by the same act, constitutes two offenses, for each of which a separate prosecution will lie, and . . . a conviction or acquittal in one case does not bar a prosecution in the other." ' [Citations.]"]; *People v. Medina* (1995) 11 Cal.4th 694, 765 [47 Cal.Rptr.2d 165, 906 P.2d 2] [rejecting the defendant's contention that double jeopardy principles should apply where the defendant already once had defended against the charges at the penalty phase of the earlier trial]; see also *United States v. Watts* (1997) 519 U.S. 148, 154–155 [136 L.Ed.2d 554, 117 S.Ct. 633].) Accordingly, defendant's double jeopardy argument must fail.

### b. Section 654

Defendant's assertion that section 654 barred the San Diego County prosecutor from proceeding against him is deficient for reasons analogous to those noted immediately above. At the time of defendant's trial, section 654 prescribed: "An act or omission which is made punishable in different ways by different provisions of this code may be punished under either of such provisions, but in no case can it be punished under more than one; an *acquittal* or *conviction and sentence* under either one bars a prosecution for the same act or omission under any other." (Stats. 1977, ch. 165, § 11, p. 644, italics added.)

Because defendant was neither acquitted nor convicted of the murder of Janette Cullins or the rape of Barbara S. in Los Angeles County, section 654 did not bar the San Diego County proceedings instituted against him for those crimes. (*People v. Carpenter, supra*, 21 Cal.4th at pp. 1038–1039 [rejecting

the defendant's contention that section 654 barred separate prosecutions in Marin County and Santa Cruz County for the crimes committed in each county]; see also *People v. Bradford, supra,* 17 Cal.3d at pp. 13–17 [where criminal behavior began in one county and, following a police chase, terminated in another, the crimes committed in each county properly were tried separately in the respective counties].)

### c. *Collateral estoppel*

■ Defendant contends the prosecutor was barred by collateral estoppel principles from trying defendant in San Diego County for the murder of Janette Cullins and the rape of Barbara S. We observe: "Traditionally, collateral estoppel has been found to bar relitigation of an issue decided at a previous proceeding 'if (1) the issue necessarily decided at the previous [proceeding] is identical to the one which is sought to be relitigated; (2) the previous [proceeding] resulted in a final judgment on the merits; and (3) the party against whom collateral estoppel is asserted was a party or in privity with a party at the prior [proceeding].' [¶] It is implicit in this three-prong test that only issues actually litigated in the initial action may be precluded from the second proceeding under the collateral estoppel doctrine. [Citation.] An issue is actually litigated '[w]hen [it] is *properly raised,* by the pleadings or otherwise, and is submitted for determination, and is *determined . . . .*' " (*People v. Sims* (1982) 32 Cal.3d 468, 484 [186 Cal.Rptr. 77, 651 P.2d 321], fn. omitted; see also *People v. Taylor* (1974) 12 Cal.3d 686, 695 [117 Cal.Rptr. 70, 527 P.2d 622] [the doctrine's purposes are: "(1) to promote judicial economy by minimizing repetitive litigation; (2) to prevent inconsistent judgments which undermine the integrity of the judicial system; and (3) to provide repose by preventing a person from being harassed by vexatious litigation."].)

Here, the circumstance that the jury in the Los Angeles County proceedings never was asked to determine, and did not determine, defendant's guilt or innocence of the murder of Janette Cullins and the rape of Barbara S. defeats defendant's claim of collateral estoppel. Nor would any of the purposes of the doctrine noted above be served by its application here.

### B. *Motion to Disqualify the Trial Court Judge*

On November 5, 1990, several months prior to the commencement of trial, defendant filed a motion pursuant to Code of Civil procedure section 170.1, subdivision (a)(6), to disqualify San Diego County Superior Court Judge Melinda J. Lasater from presiding at his trial.[16]

---

[16] Code of Civil Procedure section 170.1, subdivision (a) provides in pertinent part:
"(a) A judge shall be disqualified if any one or more of the following is true: [¶] . . . [¶]
"(6) For any reason (A) the judge believes his or her recusal would further the interests of

The basis for defendant's motion was that Judge Lasater had maintained a "working relationship and a friendship with the prosecutor in this case [San Diego County Deputy District Attorney James Pippin] such that a person aware of the facts might reasonably entertain a doubt that the judge would be able to be impartial."[17]

Judge Lasater thereafter conducted a hearing in which she reviewed her contacts with Mr. Pippin that spanned a period of approximately 16 years, noting the dates when they had worked together and general information pertaining to their social contacts. During the hearing, Judge Lasater recalled, among other things, that she and Mr. Pippin had worked together in the San Diego County District Attorney's Office until she left that office in 1987, that her family and his had gone camping with other families, that her husband had purchased Mr. Pippin's son's dirt bike approximately 10 years prior to the hearing, that there had been sporadic social contacts at parties, that she had performed the wedding of Mr. Pippin's daughter at his daughter's request in August 1990, that his daughter gave her a necklace similar to necklaces given to the bridesmaids, and that Mr. Pippin's daughter had "house sat" for her approximately one year earlier, for which his daughter had been paid a "minimal amount." Judge Lasater attached a copy of the hearing transcript to her answer.[18]

---

justice, (B) the judge believes there is a substantial doubt as to his or her capacity to be impartial, or (C) a person aware of the facts might reasonably entertain a doubt that the judge would be able to be impartial. Bias or prejudice towards a lawyer in the proceeding may be grounds for disqualification."

[17] In defendant's statement of disqualification, one of his attorneys, Josephine Dedina, declared: "I accompanied Deputy District Attorney James Pippin to his office to arrange a telephone call to Judge Lasater to set a schedule for hearings. Mr. Pippin stated that he had known Judge Lasater for a long time. He had been her supervisor when she worked as a Deputy District Attorney. Mr. Pippin informed me that Judge Lasater had participated in his daughter's wedding in the summer of 1990. Mr. Pippin also stated that if the defense in this case filed the usual defense motions to declare the death penalty unconstitutional, he knew Judge Lasater would immediately deny them. [¶] This past working relationship, where the judge was the subordinate to the prosecutor, together with a relationship where Judge Lasater participated in the prosecutor's daughter's wedding several months ago, constitute facts that a person aware of those facts might reasonably entertain a doubt that the judge would be able to be impartial."

[18] Judge Lasater's answer, in pertinent part, declared: "The defendant in this case has expressed concern over my ability to be impartial due to a perceived personal relationship with the prosecutor in this case, Mr. James Pippin. After reviewing the statement of disqualification, I conducted a hearing with all parties and their counsel present in which I detailed the contacts I could remember with Mr. Pippin over the last 17 years. . . . [¶] Although I was with the district attorney's office for almost 13 years, I have had relatively few contacts with Mr. Pippin. He was my supervisor for only four months in 1974, more than 15 years ago. During my last five years with the district attorney's office, I was a division chief assigned to the Juvenile Division and Mr. Pippin was assigned as a division chief in the Superior Court division. We were essentially equals in this capacity and had very little contact. [¶] The social

On November 30, 1990, Judge Allen J. Preckle, selected by agreement of the parties, conducted a hearing on defendant's motion. Relying on *United Farm Workers of America v. Superior Court* (1985) 170 Cal.App.3d 97, 104 [216 Cal.Rptr. 4], and *Leland Stanford Junior University v. Superior Court* (1985) 173 Cal.App.3d 403, 408 [219 Cal.Rptr. 40], the court observed that "[t]he standard [for disqualification set forth in Code of Civil Procedure, section 170.1, subdivision (a)(6)] is fundamentally an objective one." Reviewing the nature of the professional and social contacts between Judge Lasater and Mr. Pippin, the court viewed "as weightless, particularly given the substantial passage of time, the assertion that a reasonable person would doubt Judge Lasater's impartiality because of her past association with Mr. Pippin . . . . [¶] . . . [¶] This court is further satisfied that any, albeit unreasonable doubt, concerning Judge Lasater's impartiality in this case would be erased by a reasonable person's being apprised of Judge Lasater's excellent reputation for integrity and fierce independence. [¶] This court, therefore, finds that a reasonable person, aware of all the facts, would not reasonably entertain a doubt that Judge Lasater will be able to be impartial in this case." The court thereafter denied defendant's motion.

Defendant did not seek review in the Court of Appeal by way of a petition for writ of mandate, the procedure required by Code of Civil Procedure section 170.3, subdivision (d).[19]

In his appeal to this court, defendant contends that the superior court below erred in denying his motion to disqualify Judge Lasater. Acknowledging his failure to comply with the writ review requirement set forth in Code of Civil

---

functions we both attended were incidental to our professional responsibilities with the district attorney's office, rather than a reflection of any close personal friendship. Our social interaction over the years has been no different than that of any other member of the legal community who occasionally engages in social activities with members of the profession. [¶] It is common practice for judges of this Court to perform wedding ceremonies for members of the legal community and their families. My agreement to perform the wedding ceremony for Mr. Pippin's daughter was such an arrangement and was done at his daughter's request, rather than Mr. Pippin's. I was not paid to perform the ceremony and specifically indicated that no fee should be paid. [¶] Mr. Pippin's alleged comments regarding my predilection in ruling on motions dealing with constitutional challenges to the death penalty, are also unfounded. As I stated at the time of the hearing referenced above, I have never seen such a motion and would consider it premature to assume such a posture until I had been presented with the issue and reviewed it. [¶] I am neither biased nor prejudiced for or against Mr. Pippin, the defendant or his counsel, and am satisfied that I can perform my duty to decide the issues presented fairly and impartially in this case."

[19] Code of Civil Procedure, section 170.3, subdivision (d), provides: "The determination of the question of the disqualification of a judge is not an appealable order and may be reviewed only by a writ of mandate from the appropriate court of appeal sought within 10 days of notice to the parties of the decision and only by the parties to the proceeding."

Procedure section 170.3, subdivision (d), defendant nevertheless asserts as a "structural defect" reviewable on appeal the "deni[al of] due process of law in violation of [the] state and federal Constitutions because the judge who presided over his case and who rendered the sentence of death was not impartial."

We find no merit in defendant's position. His failure to comply with the requirements of Code of Civil Procedure, section 170.3, subdivision (d), precludes him from challenging the denial of his statutory disqualification motion on appeal from the judgment rendered in the trial court. (*People v. Brown* (1993) 6 Cal.4th 322, 333 [24 Cal.Rptr.2d 710, 862 P.2d 710] (*Brown*).)

■ Even if we were to overlook the procedural deficiency inherent in defendant's challenge to the denial of his disqualification motion, we would find no merit in the assertion, implicit in defendant's argument, that Judge Lasater had a responsibility to recuse herself in view of her prior professional and casual social relationship with Mr. Pippin. Defendant provides no statutory or case law authority in support of that position, and we are aware of none. Because virtually all judges are drawn from the ranks of the legal profession, such prior relationships are neither unusual nor dispositive. (See *United Farm Workers of America v. Superior Court, supra,* 170 Cal.App.3d 97, 100 ["[T]he proper performance of judicial duties does not require a judge to withdraw from society and live an ascetic, antiseptic and socially sterile life. Judicial responsibility does not require shrinking every time an advocate asserts the objective and fair judge *appears* to be biased. The duty of a judge to sit where not disqualified is equally as strong as the duty not to sit when disqualified."].)

In our view, Judge Preckle correctly determined that on the facts presented in the pleadings below, a reasonable person would not entertain a doubt as to Judge Lasater's impartiality. (See *United Farm Workers of America v. Superior Court, supra,* 170 Cal.App.3d at pp. 105–106; cf. *Sincavage v. Superior Court* (1996) 42 Cal.App.4th 224, 230–231 [49 Cal.Rptr.2d 615] [disqualification proper where, 13 years earlier, judge had been a prosecutor representing the People in other proceedings against the defendant].) Accordingly, disqualification was not mandated in the present case.

Defendant asserts a nonstatutory due process claim based upon evidence of bias adduced at trial. We need not decide whether defendant has forfeited this claim by failing to file a writ petition on this ground (see generally *Brown, supra,* 6 Cal.4th at p. 336), because his claim lacks merit. Specifically, defendant cites Judge Lasater's contempt order, issued on the eve of the penalty phase (June 3, 1991), against defense counsel *and* defendant for

failure to provide penalty phase discovery to the prosecution, as well as Judge Lasater's observation, made in considering defendant's application to modify the death sentence rendered by the jury, that defendant "frankly had no intention of testifying in Los Angeles."[20]

Neither of the actions cited by defendant, extracted from a trial court record in excess of 9,000 pages, remotely approaches the threshold required to establish the existence of judicial bias. (See *People v. Clark* (1992) 3 Cal.4th 41, 143 [10 Cal.Rptr.2d 554, 833 P.2d 561] ["The question for us to decide is whether the judge 'officiously and unnecessarily usurp[ed] the duties of the prosecutor . . . and in so doing create[d] the impression that he [was] allying himself with the prosecution . . . .' "].) Moreover, our independent review of the entire record reveals a trial court judge who was scrupulously fair and courteous to each side, and whose rulings exhibited neither bias nor prejudice. We therefore reject defendant's claim.

## C. *Motion to Exclude Evidence of Wood Chips*

At the preliminary hearing, Cheri Phinney testified that in April 1984, she decided to move into the apartment occupied by Janette Cullins. On April 12, Phinney was at the apartment, painting her new bedroom and bathroom. Phinney recalled that the carpet area in the living room near the front door had been vacuumed. At the time Phinney departed from the apartment, between 7:00 and 7:15 p.m., she did not notice any damage to the doorjamb surrounding the front door or any wood chips on the carpet beneath the door latch. When Phinney returned to the apartment on the morning of April 14, shortly before the discovery of Janette Cullins's body, she noticed wood chips on the floor, as depicted in a photograph introduced by the prosecution. On cross-examination, Phinney acknowledged that on April 14, she did not mention the wood chips to the investigating detective and she also failed to mention the wood chips during her testimony at defendant's trial in Los Angeles County.

San Diego Police Department Homicide Detective James Shively testified that as part of his investigation of the crime scene on April 14, he directed that the wood chips be photographed. On cross-examination, Detective Shively acknowledged he did not mention the wood chips in the crime scene report that he prepared. He further acknowledged that under his direction,

---

[20] Far from exhibiting bias, Judge Lasater's comment in fact was made while *explaining the basis* for the court's denial of defendant's claim that he had been denied his right to testify in the Los Angeles proceedings. Her comment was based upon her review of the transcripts of both proceedings as well as her discussions with defendant under seal, and was made in the specific context of expressing the view that defendant "was using [the denial of the right to testify] issue as a tactical means for obtaining a reversal . . . ."

evidence technician Dannis Nuckolls removed a portion of the doorjamb. Detective Shively did not recall whether he directed anyone to collect the wood chips.[21]

San Diego Police Department Sergeant Douglas Naliboff testified that when he responded to the crime scene on the morning of April 14, the doorjamb "appeared that it had been pried open. There were wood chips separated from the doorjamb itself and laying on the floor." He identified the prosecution's photographs as depicting the doorjamb and wood chips that he observed.

Defendant moved to exclude all evidence related to the condition of the front door of Janette Cullins's apartment, including testimony regarding the doorjamb and the wood chips, and photographs of the wood chips. The basis for his motion was that the prosecution assertedly had "failed to preserve the wood debris, and carelessly removed the door and doorjamb removed and photographed [*sic*]." Defendant asserted that the prosecution's failure to preserve the "potentially exculpatory wood chips" violated defendant's constitutional rights to a fair trial and due process of law, and that pursuant to Evidence Code section 352 the testimonial or photographic evidence was not admissible in the absence of the wood chips themselves.

The trial court denied defendant's motion, finding: "Defendant's . . . motion to exclude . . . the wood chips evidence and doorjam[b] is denied. There is an insufficient showing of bad faith by law enforcement as shown in [*Arizona v.*] *Youngblood* [(1988) 488 U.S. 51 [102 L.Ed.2d 281, 109 S.Ct. 333]]. In addition, the probative value of the evidence more than substantially outweighs any prejudice of the failure to preserve the wood chips. [¶] The record should reflect that law enforcement took pictures of the evidence from several angles and preserved the door jam[b], itself. They apparently did not actually preserve the wood chips which are reflected in the pictures."

On appeal, defendant contends the trial court erred in denying his motion to exclude this evidence. He argues that because the charge of burglary, as well as the burglary and lying-in-wait special circumstances, each depended upon the prosecution establishing that defendant unlawfully entered Cullins's apartment, "the government['s] fail[ure] to preserve evidence which was material and potential[ly] exculpatory" deprived him of a myriad of state and federal constitutional rights. Defendant further asserts that the photographs of the wood chips could have been taken *after* the doorjamb was removed, and thus the failure to preserve the wood chips deprived defendant of the

---

[21] At trial, Nuckolls testified that he took photographs of the doorjamb and the wood chips and subsequently removed a portion of the doorjamb, but did not retain the wood chips and did not know what happened to them.

opportunity to demonstrate that the presence of the chips "may have been the result of Nuckolls's post-crime removal of wood." Defendant maintains that the trial court's denial of his motion to exclude evidence was not harmless beyond a reasonable doubt and requires reversal, and further that the trial court's ruling constituted an abuse of discretion under Evidence Code section 352.

For the reasons that follow, defendant's position lacks merit.

██ "Law enforcement agencies have a duty, under the due process clause of the Fourteenth Amendment, to preserve evidence 'that might be expected to play a significant role in the suspect's defense.' (*California* v. *Trombetta* (1984) 467 U.S. 479, 488 [81 L.Ed.2d 413, 104 S.Ct. 2528, 2534]; accord, *People* v. *Beeler* (1995) 9 Cal.4th 953, 976 [39 Cal.Rptr.2d 607, 891 P.2d 153].) To fall within the scope of this duty, the evidence 'must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.' (*California* v. *Trombetta*, *supra*, 467 U.S. at p. 489 [104 S.Ct. at p. 2534]; *People* v. *Beeler*, *supra*, 9 Cal.4th at p. 976). The state's responsibility is further limited when the defendant's challenge is to 'the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant.' (*Arizona* v. *Youngblood*[, *supra*,] 488 U.S. 51, 57 [102 L.Ed.2d 281, 109 S.Ct. 333, 337].) In such case, 'unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.' (*Id.* at p. 58 [109 S.Ct. at p. 337]; accord, *People* v. *Beeler*, *supra*, 9 Cal.4th at p. 976.)

"On review, we must determine whether, viewing the evidence in the light most favorable to the superior court's finding, there was substantial evidence to support its ruling. (*People* v. *Griffin* (1988) 46 Cal.3d 1011, 1022 [251 Cal.Rptr. 643, 761 P.2d 103].)" (*People v. Roybal* (1998) 19 Cal.4th 481, 509–510 [79 Cal.Rptr.2d 487, 966 P.2d 521]; see also *People v. Cooper* (1991) 53 Cal.3d 771, 810 [281 Cal.Rptr. 90, 809 P.2d 865].)

Under this standard, the court below did not err in concluding there was no showing of bad faith by law enforcement in failing to preserve the evidence; none of the testimony at the preliminary hearing (or trial) suggested otherwise. Similarly, nothing in the record suggests that the court below erred in determining that the wood chips did not have an exculpatory value that was apparent prior to their disappearance, or that the wood chip evidence was of such a nature that defendant was unable to obtain comparable evidence by other reasonably available means. (See *People v. Cooper*, *supra*, 53 Cal.3d 771, 810.)

Nor do we find any abuse of discretion in the court's determination that the probative value of the evidence substantially outweighed any prejudice that could be attributed to the failure to preserve the wood chips that had been observed by Cheri Phinney and Sergeant Naliboff. Investigators photographed the wood chip evidence. The photographic evidence indicated that someone had forced an entry into Janette Cullins's apartment, and therefore was probative as to the burglary charge and the burglary special circumstance. Defendant does not demonstrate how, in the absence of the wood chips themselves, the trial court abused its discretion in denying defendant's motion to exclude the testimony and photographs of the wood chips. Defendant's assertion that removal of a portion of the doorjamb during the investigation might have created the wood chips is speculative and has no bearing on whether the trial court abused its discretion in denying defendant's motion to exclude the evidence.

## II. *JURY SELECTION ISSUES*

Defendant contends the trial court erroneously prohibited sequestered voir dire examination of prospective jurors, unfairly restricted the examination of the prospective jurors by counsel, conducted voir dire in an oppressive atmosphere, improperly instructed prospective jurors, and applied an incorrect standard to exclude persons from the jury. In view of these asserted errors, defendant contends he was denied a myriad of rights guaranteed to him under the state and federal Constitutions and therefore his conviction and sentence must be reversed. As we shall explain, none of defendant's contentions has merit.

### A. *Defendant's Motion for Sequestered Voir Dire*

At the commencement of jury selection, defendant moved for sequestered voir dire of prospective jurors pursuant to *Hovey v. Superior Court* (1980) 28 Cal.3d 1 [168 Cal.Rptr. 128, 616 P.2d 1301]. The prosecution joined in the request. The trial court denied the motion, stating that "Proposition 115 is the law and is applicable. . . . [¶] And I intend to follow Proposition 115, and that includes, at this particular point in time, I'm not going to be using a sequestered inquiry of the jurors. [¶] In making that decision, I'm exercising my discretion as well as requested by the People." When defendant renewed his request, the trial court repeated its denial.

On appeal, defendant contends he was "denied meaningful voir dire by the court's improper procedures," including the trial court's denial of sequestered voir dire. He is mistaken. Proposition 115, which took effect on June 6, 1990 (approximately eight months prior to jury selection here), enacted Code of Civil Procedure section 223, which in relevant part provided (prior to its

amendment in 2000): "In a criminal case, the court shall conduct the examination of prospective jurors[, and such examination] . . . shall, where practicable, occur in the presence of other jurors in all criminal cases, including death penalty cases." (Stats. 1990, p. A-245, italics omitted.)[22]

Moreover, we repeatedly have rejected contentions similar to those advanced by defendant. (See, e.g. *People v. San Nicolas* (2004) 34 Cal.4th 614, 633–634 [21 Cal.Rptr.3d 612, 101 P.3d 509]; *People v. Ramos* (2004) 34 Cal.4th 494, 513–515 [21 Cal.Rptr.3d 575, 101 P.3d 478]; *People v. Slaughter* (2002) 27 Cal.4th 1187, 1199 [120 Cal.Rptr.2d 477, 47 P.3d 262]; *People v. Box* (2000) 23 Cal.4th 1153, 1180–1181 [99 Cal.Rptr.2d 69, 5 P.3d 130]; see also *People v. Waidla* (2000) 22 Cal.4th 690, 713 [94 Cal.Rptr.2d 396, 996 P.2d 46] [Proposition 115 "abrogates" the requirement found in *Hovey v. Superior Court, supra,* 28 Cal.3d at p. 80, of individual sequestered voir dire examination of prospective jurors during the death qualification portion of jury selection in a capital case]; *Tapia v. Superior Court* (1991) 53 Cal.3d 282, 288 [279 Cal.Rptr. 592, 807 P.2d 434] [applying Proposition 115 to crimes committed prior to enactment of the new statute, where (as here), the trial is conducted after its enactment].) Defendant has not provided us with any persuasive basis for revisiting the holdings in those decisions, and we decline to do so.

The trial court made clear that its ruling was guided by the provisions set forth in Code of Civil Procedure section 223. The court also explained at length the basis for its exercise of discretion in denying the requests for sequestered voir dire. No error or abuse of discretion appears.

---

[22] At the time of defendant's trial, Code of Civil Procedure section 223 in full provided as follows (Prop. 115, § 7, as approved by voters, Primary Elec. (June 5, 1990)):

"In a criminal case, the court shall conduct the examination of prospective jurors. However, the court may permit the parties, upon a showing of good cause, to supplement the examination by such further inquiry as it deems proper, or shall itself submit to the prospective jurors upon such a showing, such additional questions by the parties as it deems proper. Voir dire of any prospective jurors shall, where practicable, occur in the presence of the other jurors in all criminal cases, including death penalty cases.

"Examination of prospective jurors shall be conducted only in aid of the exercise of challenges for cause.

"The trial court's exercise of its discretion in the manner in which voir dire is conducted shall not cause any conviction to be reversed unless the exercise of that discretion has resulted in a miscarriage of justice, as specified in Section 13 of Article VI of the California Constitution." (Stats. 1990, p. A-245, italics omitted.)

## B. *The Trial Court's Imposition of Time Limits on Voir Dire*

The trial court permitted counsel for each party to have 60 minutes to conduct voir dire of the first 20 prospective jurors, and gave 30 minutes to each side for each additional group of nine jurors. The defense and prosecution each protested vociferously that the court's limits were unduly restrictive.[23] The parties repeatedly moved the court to reconsider its ruling, each side citing the difficulty of ascertaining a prospective juror's views during group voir dire within the time allotted by the trial court. The court denied these requests, expressing confidence that the process would afford counsel an adequate amount of time in which to conduct the voir dire examination.[24]

---

[23] In seeking additional time in which to conduct the voir dire examination, defense counsel argued: "I would like more time than 60 minutes for the first 20 [jurors], and more time than 30 minutes with the fill-in jurors. [¶] Since it appears to me that the time being set is more or less arbitrary, in other words, Your Honor is just picking a figure sort of out of the air, 60 minutes, it could just as well be 90, 120, something like that. [¶] Sixty minutes is only an average of three minutes per juror, and that simply is not enough in a capital case."

Defense cocounsel added: "No disrespect to the court, the speed of this, I don't have time to reflect. . . . I do not have time to consider[,] to reflect, to confer. One of the purposes to hav[ing] two attorney[s] is to be able to confer, and I don't have the time to reflect and think this is the right decision. And I would appreciate the time to do that after the questions to be able to confer with [lead defense counsel] . . . . [¶] . . . I don't want to be . . . speeded along on this without making the right objections for the record. And I feel at some points that I'm not thinking swiftly enough because of the time constraints."

The prosecutor similarly argued: "To tell us that you only get an average of three minutes per juror to decide a case I think is unfair, and I don't think there is a legitimate reason for it."

[24] The trial court informed the parties in relevant part as follows:

"You'll be permitted to ask [prospective] jurors questions which are properly phrased and not repetitive of what is in the questionnaire directly yourselves. . . . [¶] . . . [¶]

"Now, let me give you a caveat on that: I don't want to be going back over what's in the questionnaires with them. [¶] . . . [¶]

"[K]eep in mind if it's truly a follow-up question, something that's in the questionnaire, you should be giving it to me. [¶] . . . [¶]

"You can go to L.A. where they don't allow any inquiry [by counsel on voir dire], in some instances, even on capital cases. [¶] . . . [¶]

"But logic would dictate that if your main concern happens to be someone's reaction to sexual assault, or you have a particular [prospective] juror who you think you have got a problem with . . . a particular issue, or if your main concern with a particular witness is their belief on the death penalty, then you're going to want to ask to spend more time on that particular [prospective] juror on those areas.

"What you're going to want to do is ask some of your general questions . . . as a whole of the panel, and then to spot-check certain people who you're not really comfortable with.

"I mean there are different techniques of voir dire.

"If you decide that you want to go through each [prospective] juror one by one and ask the same set of questions, you're going to end up with three minutes per [prospective] juror.

"That's a decision that each side is going to have to make.

"But that is going to be the decision that you're going to make, because I believe that based upon my experience in using this technique and watching attorneys inquire, that you can cover more than adequately with 20 [prospective] jurors in 60 minutes what I have told you that you could cover. [¶] . . . [¶]

■ On appeal, defendant contends the trial court's restriction of the amount of time permitted each side in obtaining answers to questions was improper and resulted in a denial of meaningful voir dire. We have observed that the adequacy of voir dire is a matter " ' "not easily subject to appellate review. The trial judge's function at this point in the trial is not unlike that of the jurors later on in the trial. Both must reach conclusions as to impartiality and credibility by relying on their own evaluations of demeanor evidence and responses to questions." ' " (*People v. Holt* (1997) 15 Cal.4th 619, 661 [63 Cal.Rptr.2d 782, 937 P.2d 213], quoting *Mu'Min v. Virginia* (1991) 500 U.S. 415, 424 [114 L.Ed.2d 493, 111 S.Ct. 1899]; see also *People v. Cardenas* (1997) 53 Cal.App.4th 240, 247 [61 Cal.Rptr.2d 583] [" 'The exercise of discretion by trial judges under the new system of court-conducted voir dire is accorded considerable deference by appellate courts.' "]; *People v. Taylor* (1992) 5 Cal.App.4th 1299, 1313 [7 Cal.Rptr.2d 676] [same].) The applicable standard is a demanding one: "Unless the voir dire by a court is so inadequate that the reviewing court can say that the resulting trial was fundamentally unfair, the manner in which voir dire is conducted is not a basis for reversal. [Citation.] A fortiori, the same standard of reversible error applies when both the court and counsel participate in the voir dire." (*People v. Holt, supra,* 15

---

"When I initially g[a]ve you the time periods, I believe I said . . . : that you would have the opportunity to . . . give me follow-up questions on the questionnaire.

"This is in addition to any questions I may decide to ask.

"Second of all, that if I didn't follow-up on an area in a questionnaire adequately and you want me to ask some more questions on a particular subject on a particular [prospective] juror, that I would be giving you that opportunity to ask me to do that.

"This is all prior to you asking questions.

"Finally, I said that each . . . side would have one hour to inquire on those limited subjects without repeating questions in the questionnaire.

"I also said that if there was a response from a particular [prospective] juror that needed additional follow-up that seemed to be out of the ordinary, that I would be taking that into consideration in looking at the time period which you have.

"Now, if I feel, after I have done the inquiry of the [prospective] jurors, that there are some problem [prospective] jurors that you're going to need additional time with, I'm going to give you the time up front before you start your hour.

"If you hit upon something that hasn't surfaced, then what you need to do is prior to your hour['s] expiration say to me[,] [']Judge, I need some additional time. I think, I'm concerned about this particular area.[']

"I'll let you know at that time, but for your planning purposes . . . I'm not going to change the hour and [the] 30 minute [time periods], because I think you can . . . more than adequately cover the subjects that you have if you are concentrating on those particular subjects.

"If it appears based upon the inquiry that it's not working, I'm going to make a modification on the spot. [¶] . . . [¶]

"But I am still comfortable in light of your positions, and I can understand your trepidation at trying to do the inquiry in one hour, but in the long run an hour efficiently used can be very effective, and more effective than if you were to spend two or three hours and felt as if you had all the additional time.

"But if we run into a problem, you know, I'm going to be watching for it, and I'm willing to listen to your positions on it."

Cal.4th at p. 661; see also *People v. Bolden* (2002) 29 Cal.4th 515, 538 [127 Cal.Rptr.2d 802, 58 P.3d 931] [same].)

■ Our review of the record reveals the voir dire examination conducted here was more than adequate. The trial court informed the parties that if, in addition to the initial questions posed by the court and by each side, counsel desired that further inquiries be made of a prospective juror, counsel would be given the opportunity to request that the court ask followup questions directed to those particular jurors. "The right to voir dire, like the right to peremptorily challenge [citation], is not a constitutional right but a means to achieve the end of an impartial jury. [Citation.] . . . [I]t is the duty of the trial judge to restrict the examination of the prospective jurors within reasonable bounds so as to expedite the trial. [Citations.]" (*People v. Wright* (1990) 52 Cal.3d 367, 419 [276 Cal.Rptr. 731, 802 P.2d 221]; see also *People v. Bittaker* (1989) 48 Cal.3d 1046, 1086 [259 Cal.Rptr. 630, 774 P.2d 659].)

In view of the circumstance that the parties clearly were given the opportunity to elicit information on voir dire, we conclude, consistent with our foregoing pronouncements, that the time limits of which defendant complains did not prevent defense counsel from making reasonable inquiries into the fitness of prospective jurors to serve on the jury. No error or abuse of discretion appears. (See e.g., *People v. Carpenter* (1997) 15 Cal.4th 312, 353-354 [63 Cal.Rptr.2d 1, 935 P.2d 708]; *People v. Lucas* (1995) 12 Cal.4th 415, 480 [48 Cal.Rptr.2d 525, 907 P.2d 373].)[25]

Moreover, even were we to assume that the trial court abused its discretion in restricting voir dire, defendant has failed to establish prejudice. (See *People v. Carpenter*, *supra*, 15 Cal.4th at p. 354; see also *People v. Bittaker*, *supra*, 48 Cal.3d at p. 1082 [no abuse of discretion where the court formulated four specific questions to ask prospective jurors during the death-qualifying process, and refused to permit further questions from counsel].) The trial court's rulings were minimally restrictive, and the circumstance that both parties passionately argued against them suggests that the

---

[25] We also observe that, pursuant to Code of Civil Procedure section 205, the trial court permitted the use of written juror questionnaires, and that each of the questionnaires employed was comprised of 135 questions that spanned 30 pages. (See fn. 24, *ante*.)

Defendant contends the trial court improperly restricted the scope of the questions used in the questionnaire, and specifically notes the trial court's refusal to permit questions "that might suggest 'substantial impairment' under *Wainwright v. Witt* (1985) 469 U.S. 412 [83 L.Ed.2d 841, 105 S.Ct. 844], deciding instead that the questionnaire should only inquire whether a juror would 'automatically' refuse or vote for death or life imprisonment." The trial court was not required to ensure that a particular question regarding a specific legal doctrine would be asked. (See *People v. Johnson* (1989) 47 Cal.3d 1194, 1224 [255 Cal.Rptr. 569, 767 P.2d 1047].) In any event, in passing, we observe that nine questions (including numerous subquestions) spanning five pages of the very thorough questionnaire were aimed directly at eliciting the views of prospective jurors regarding the death penalty.

court's restrictions did not disproportionately impact one side to the advantage of the other. Jury selection required eight court days, a period of time hardly indicative of an unduly rapid proceeding.

### C. *The Atmosphere in the Courtroom*

At certain points during the voir dire examination, defense counsel complained about the overcrowded conditions occasioned by the large number of prospective jurors who had been directed into the courtroom. At one point, counsel declared: "There is a carnival atmosphere in here not fitting for this kind of case. We've got a hundred and I don't know how many people jammed into this one courtroom. Jurors are complaining. It is extremely uncomfortable, not only for the jurors, but for counsel. And the whole . . . atmosphere militates against the calm deliberation which we ought to be applying to this case." On another occasion, the court informed the jury venire: "I don't want you to think that since all these chairs are so close up here that I'm just doing that to harass you, because given the way the last few days have gone for most of us, I wouldn't be surprised if you thought that." On yet another occasion, the court indicated that it had received a note from a prospective juror that read, "Can you lower the room temperature, it's too stuffy, etc.," to which the court responded, "We didn't need to have him tell us."

Defendant characterizes the atmosphere in the courtroom during the voir dire examination as having been "oppressive," a circumstance that he contends—when viewed either singly or together with the trial court's other asserted errors—warrants reversal. We disagree. The panel was comprised of 140 prospective jurors. Although the warm, crowded conditions in the courtroom undoubtedly were neither optimum nor particularly comfortable, they did not deprive defendant of any rights to which he was entitled. To the extent defendant's claim is directed at the difficult "working conditions" under which the defense was forced to operate during voir dire, the prosecution was compelled to perform under the identical challenging conditions. To the extent defendant's claim is directed at the potentially adverse impact the conditions may have had upon prospective jurors, we observe that defendant was entitled to an impartial jury, not a contented one. Although defendant's representations as to the nature of the courtroom atmosphere portray a challenging environment for all concerned, we observe that the eight-day duration of these conditions was not inordinately lengthy.

Significantly, the defense had six peremptory challenges remaining when it accepted the jury—a circumstance indicating that, notwithstanding defendant's arguments regarding the "oppressive" nature of the courtroom atmosphere, the defense was not dissatisfied with the jury as sworn. Indeed, the

defense *requested* that the jury be sworn. " 'When the jury was finally selected, defendant did not claim that any juror was incompetent, or was not impartial. We therefore find no prejudicial error.' " (*People v. Carpenter*, *supra*, 15 Cal.4th at p. 354.)[26]

### D. *The Trial Court's Voir Dire Examination of Prospective Jurors*

Defendant contends the trial court misled prospective jurors, some of whom eventually were sworn as jurors in the case, by conducting an "improper and misleading voir dire examination [that] left the defense guessing at bias or prejudice," and by misstating the law related to the penalty phase of the proceedings. Defendant refers to assertedly imprecise questions posed by the trial court, and its repeated use during voir dire of inquiries such as, "would you *hesitate* to vote for the death penalty, and would you have a *tendency* to vote for the death penalty?" (Italics added.) Further, in response to questions posed by prospective jurors as to whether the "weighing process" described by the court would involve a "moral decision," the trial court answered in the negative. Defendant contends that this response by the court conflicted with CALJIC No. 8.88 (1989 rev.), which specifically instructed jurors that "You are free to assign whatever *moral* or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider." (Italics added.) Defendant further asserts that "the record does not demonstrate adequate bases for trial court rulings on challenges for cause, in large part because it is not clear the views of prospective jurors would have prevented or substantially impaired performance of their duties as jurors."

Our review of the trial court's voir dire examination reveals that although defendant is correct that certain statements made by the court lacked precision, may have been overly simplistic, and contained technical misstatements of law, the court made clear that its comments were "not instructions on the law which I'm giving you at this time. You'll receive, if you're selected as a juror, the actual instructions on the law in their full detail later." We believe the court's admonition made clear that its comments were directed toward generally familiarizing the prospective jurors with the tasks ahead in order to elicit responses from them that would assist the parties in determining whether or not to exercise their available challenges. Significantly, counsel were given the opportunity to ask followup questions of prospective jurors.

---

[26] The trial court denied the parties' joint request to increase the number of their respective peremptory challenges from 20, the amount specified under Code of Civil Procedure section 231, subdivision (a), to 26.

### E. Trial Court's Rulings on Challenges for Cause

■ In considering defendant's contention that the trial court erred in ruling on challenges for cause, we are guided by well established principles. If, as occurred in the present case, a defendant has unused peremptory challenges available when the trial court impanels the jury, and the defendant does not express dissatisfaction with the jury ultimately selected, his or her claim is not preserved on appeal. (*People v. Ochoa* (1998) 19 Cal.4th 353, 444 [79 Cal.Rptr.2d 408, 966 P.2d 442].) Even were defendant's claim properly preserved, we would reject it on the merits because he has failed to identify any prospective juror who he contends was improperly retained on the jury despite a valid challenge for cause, or one who erroneously was removed for cause. In view of defendant's failure to establish specific reversible error, his contention must fail.

## III. GUILT PHASE ISSUES

### A. Testimony of Polly Haisha

Over defendant's objection on the ground of lack of relevancy, the prosecution introduced the testimony of Polly Haisha, an acquaintance of defendant's, who, as a senior in high school, met defendant at a party in February 1984. Haisha testified that she accepted defendant's invitation at the party to go sailing with him and gave him her telephone number, but subsequently cancelled the date because she "just felt really uncomfortable about the whole thing. I had a weird feeling about it. I ca[lled] him up and canceled. I made up an excuse why I couldn't go . . . ." Haisha and defendant spoke several times in the ensuing weeks; the two repeatedly rescheduled their date but, in Haisha's words, "I would always cancel out shortly before we were supposed to meet." Haisha identified defendant in court and in photographic exhibits. She also verified that an entry in defendant's address book was her telephone number at the time (observing, however, that her name had been misspelled).[27]

Haisha further testified that upon informing defendant during one of their initial conversations of her plans to attend college, he responded: "You know, that's just a waste. He said why don't you quiet [*sic*] school and come sail to France with me. You'll get a better experience of life there than you could in school. [¶] I said, well, you know, that might be so, but I plan on going to college. I barely know you. I'm not going to give up my life so I can sail to France with you."

---

[27] In addition to Polly Haisha's name, the address book contained the names of murder victims Susan Knoll and Janette Cullins.

In response to the prosecutor's inquiry regarding defendant's demeanor on the telephone, Haisha testified: "Well, the very first time I talked to him the next day after I met him at the party, he was really nice and very open to what we could do, and anything that I wanted—to whenever we wanted to meet after that. [¶] It got— he got more and more aggressive. Like the time I said I wouldn't go to France with him, he acted like I was making fun of him; somehow that was a stupid idea or something. [¶] He would get kind of mean and when I would cancel on dates, he would get kind of irritated, like he had to change his whole schedule for me. Yet, again, he wasn't happy. [¶] It kind of scared me, but he would always tone it down towards the end so I wouldn't be afraid to talk with him the next time. [¶] . . . [¶] Later on, towards the end of our phone conversations, he mentioned his ex-wife . . . and at that time he was really bitter about it and, you know, would call her names and said he was happy that part of his life was over. He was happy to get away from her. [¶] He called her a bitch."

Haisha also testified that in the evening of March 24, 1984, defendant contacted her by telephone and informed her he would be in San Diego on the following day. In response, Haisha "asked him at the end of our phone call never to call me again, and that I didn't want to talk to him anymore. [¶] I certainly didn't want to see him, and he became very irritated and said why all of a sudden this change, we haven't even gone out yet. [¶] I said well, I don't feel comfortable about talking to you or seeing you. I would rather this ended right now, and would you please just never call this number again. . . . [¶] He was very irritated and he started getting mad and almost hostile. That's when I knew for sure I made the right choice, because at previous times in phone conversations he had gotten that way." She added that she did not remember defendant ever contacting her again after that.

On cross-examination, Haisha testified that during the time period in which defendant was on trial (April 1991), she was a law student who, in the previous year, had worked as an intern in the San Diego County District Attorney's Office, and that she planned to return to that office again to work as an intern after taking the bar examination that upcoming summer.

On appeal, defendant reiterates his contention at trial that Haisha's testimony was irrelevant and that it warranted exclusion for that reason, additionally asserting on appeal that the testimony was highly prejudicial, "designed to inflame the jury," and constituted improperly admitted character evidence (Evid. Code, § 1101, subd. (b)), and that the trial court erred in failing to exercise its discretion under Evidence Code section 352 to exclude this evidence. Defendant adds that the trial court's admission of Haisha's testimony violated a panoply of defendant's state and federal constitutional rights.

Preliminarily, we observe that defendant did not object at trial based upon Evidence Code section 352 or 1101—a point acknowledged by defendant but apparently overlooked by the People—and therefore has not preserved this claim for our review. (See, e.g., *People v. Boyette* (2002) 29 Cal.4th 381, 424 [127 Cal.Rptr.2d 544, 58 P.3d 391].)

With regard to the substance of defendant's contentions, we conclude they are without merit for reasons similar to those set forth in response to defendant's challenge to the admission of other evidence introduced in the Los Angeles proceedings. (See *People v. Carter, supra,* 36 Cal.4th at pp. 1165–1173.) In view of our more extensive summary of the applicable legal principles involving relevancy and prejudice in the companion appeal, the brief analysis that follows shall suffice.

The prosecution met its burden of establishing that the testimony of Polly Haisha was relevant under Evidence Code section 210. Haisha's testimony corroborated the testimony of Susan Loyland that defendant intended to be in San Diego on March 25, 1984, the date on which Loyland's housemate, Barbara S., was raped in San Diego, and after which neither Haisha nor Loyland ever heard from defendant again. Haisha's testimony also bolstered the prosecution's theory of the case that defendant embarked upon his murderous crime spree in the immediate aftermath of being spurned by a number of women, including Haisha. (See *ante,* at pp. 1221–1223.) Implicit in the prosecution's theory is that these rejections comprised a "trigger" that, once pulled, propelled defendant to rape and murder women whom he recently had befriended. Accordingly, defendant's demeanor during his conversations with Haisha—including his frustration and anger when Haisha cancelled their scheduled dates—in the weeks leading up to the murders and other crimes appears relevant.

The evidence was not unduly prejudicial. It merely described Haisha's initial encounter with defendant at a party and his subsequent fruitless efforts to meet her again, causing him to become irritated or angry. The testimony was not altogether uncomplimentary, as Haisha recalled that during their first telephone conversation, defendant "was really nice."

The trial court did not abuse its discretion in denying defendant's motion to exclude Haisha's testimony. Further, viewed in the context of defendant's trial, in which the prosecution's evidence overwhelmingly established that defendant committed multiple brutal murders and vicious rapes, the testimony of Polly Haisha—a woman whom defendant did not physically attack, and who had only minimal personal contact with him—was not even remotely prejudicial.

Citing Evidence Code section 1101, subdivision (a), defendant also contends Haisha's testimony was "improperly admitted character evidence, and no doubt carried over to penalty phase as non-statutory aggravation evidence."[28] Defendant's argument fails because, as noted, it was not presented at the trial court, nor did admission of the evidence violate Evidence Code section 1101, subdivision (a), because the prosecution did not offer Haisha's testimony to prove defendant's conduct on a specific occasion. Finally, it is not reasonably possible that the evidence "carried over" as an aggravating circumstance to the penalty phase, or that in the absence of the evidence defendant would have received a more favorable penalty verdict. As noted above, a massive amount of other, far more damaging evidence was introduced against defendant at the guilt and penalty phases of the trial.

Considered as guilt phase evidence, even if we were to determine under any theory that the trial court abused its discretion in admitting the testimony of Polly Haisha, such error would have been harmless under the applicable *Watson* standard, because it is not reasonably probable that the jury would have reached a different result in the absence of Haisha's testimony. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)[29]

### B. *Sufficiency of the Evidence*

■ Defendant contends the evidence was insufficient to support his conviction of the crimes committed against Barbara S. and Janette Cullins, as well as the prior murder and lying-in-wait special-circumstance findings. "In reviewing a criminal conviction challenged as lacking evidentiary support, ' "the court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a

---

[28] Subject to certain exceptions not relevant to our discussion, Evidence Code section 1101, subdivision (a), provides: "[E]vidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion."

[29] In view of our conclusion that the trial court properly admitted the testimony of Polly Haisha, defendant's contention that his trial counsel's "failure to assert the proper objection [under Evidence Code sections 352 and 1101, subdivision (a)] constitutes ineffective assistance of counsel" necessarily fails. (See, e.g., *People v. Memro* (1995) 11 Cal.4th 786, 834 [47 Cal.Rptr.2d 219, 905 P.2d 1305]; *People v. Frierson* (1991) 53 Cal.3d 730, 747 [280 Cal.Rptr. 440, 808 P.2d 1197].)

reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.]' (*People v. Hillhouse* (2002) 27 Cal.4th 469, 496 [117 Cal.Rptr.2d 45, 40 P.3d 754].) The same standard of review applies to special circumstance allegations. (*People v. Maury* (2003) 30 Cal.4th 342, 396 [133 Cal.Rptr.2d 561, 68 P.3d 1].) An appellate court must accept logical inferences that the jury might have drawn from the evidence even if the court would have concluded otherwise. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11 [82 Cal.Rptr.2d 413, 971 P.2d 618].)" (*People v. Combs* (2004) 34 Cal.4th 821, 849 [22 Cal.Rptr.3d 61, 101 P.3d 1007].)

### 1. *The Crimes Committed Against Barbara S.*

Defendant contends his conviction of the crimes committed against Barbara S. is not supported by sufficient evidence. He is mistaken.

As we have noted (*ante,* at pp. 1221–1226), one day after having been rejected by Polly Haisha and Cathleen Tiner, defendant arrived in San Diego on March 25, 1984, having made plans to travel to Mexico that day with Susan Loyland, who departed from San Diego without him. Janell Barksdale, the next-door neighbor of Barbara S. and Susan Loyland, observed defendant approaching the victims' residence on the evening of March 25. That evening, defendant broke into Loyland's residence, stole some of her tip money from a concealed location that previously had been revealed to him, and raped at knifepoint Barbara S., Loyland's housemate.

Barbara S. provided details of the rape, oral copulation, robbery, and burglary, including the circumstances that her assailant's voice sounded familiar to her and that weeks later she recognized the voice as defendant's. At trial, she identified defendant as the man who attacked her. Susan Loyland established that defendant had seen the location where she had concealed the money determined to have been taken from her bedroom, and explained why she suspected defendant might have been Barbara S.'s assailant.

Defendant glosses over the foregoing highly incriminating evidence, instead emphasizing Barbara S.'s general uncertainty and inability to identify her assailant in the immediate aftermath of the attack. Defendant also asserts the prosecution "clearly bootstrapped" its case in the Barbara S. sexual assault to the "other crimes" evidence implicating defendant in the murders of Susan Knoll, Jillette Mills, Bonnie Guthrie, and Janette Cullins, the death of Tok Kim, and the sexual assault of Jennifer S. He further asserts that the evidence supporting the convictions was undermined by the fact that the trial

court excluded evidence indicating that Barbara S. suffered from alcoholism in the spring of 1984.[30]

None of defendant's points is persuasive. Barbara S.'s identification of defendant as the man who assaulted and robbed her at knifepoint in her residence was supported by her housemate's testimony that money was stolen from a concealed location known to defendant, and by a neighbor's testimony that defendant walked toward the residence on the night of the attack. Thus, the prosecution's evidence implicating defendant in the attack on Barbara S. more than adequately meets the substantial evidence standard summarized above. (*People v. Combs, supra,* 34 Cal.4th at p. 849.)[31]

### 2. *The Crimes Committed Against Janette Cullins*

Defendant contends the evidence is insufficient to sustain his conviction of murder, robbery, and burglary stemming from crimes committed at the residence of Janette Cullins on or about April 12, 1984. He challenges on similar grounds the jury's true findings as to the burglary, robbery, and lying-in-wait special circumstances. With the exception of the last special circumstance, we find unpersuasive each of these assertions.

The evidence adduced at trial established that defendant visited Janette Cullins's apartment on the afternoon of April 12, 1984, asking her new roommate, Cheri Phinney, how long Phinney planned to be there. That

---

[30] Defendant assigns error to the trial court's ruling, made pursuant to Evidence Code section 352, excluding the proffered testimony of Susan Loyland that Barbara S. suffered from alcoholism.

After conducting a foundational hearing at the People's request, outside the presence of the jury, in which Loyland described her own alcoholism and daily drug usage in the spring of 1984, the trial court explained at length its reasons for excluding Loyland's proffered testimony, stating that although the evidence "could be relevant," its admission "is going to take us in a circle of evidence that is . . . going to be nonproductive and [cause] undue consumption of time." The court added: "I'm not precluding that subject of [Barbara. S.] being an alcoholic being raised by other witnesses if the foundation can be laid."

The trial court's ruling conformed to the requirements of Evidence Code section 352. The proffered testimony regarding Barbara S.'s alleged alcoholism was marginally relevant and likely would have consumed an undue amount of court time. No abuse of discretion appears.

Moreover, even were we to conclude that the trial court ruled incorrectly, any such error plainly would have been harmless in view of the overwhelming evidence that defendant broke into the residence shared by Barbara S. and Susan Loyland, stole money belonging to each, and sexually assaulted Barbara S.

[31] In view of our holding, above, we reject as without merit defendant's related claim that the "insufficiency of the evidence" supporting the sexual assault crimes perpetrated against Barbara S. led to error at the penalty phase when the trial court admitted this evidence in aggravation pursuant to section 190.3, factor (b) ("criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence"). As noted, the evidence was sufficient; therefore defendant's argument fails.

evening, Cullins attended the symphony with her friend, Cathleen Tiner, who last saw Cullins at approximately 11:00 p.m., when Cullins departed to return to her apartment. A neighbor of Cullins observed the distinctive white Datsun 280 ZX in which defendant subsequently was arrested, parked with its engine running for several minutes late that evening. A number of Cullins's friends unsuccessfully attempted to contact Cullins on April 13.

A visitor to Cullins's apartment on April 14 noticed wood chips on the floor by the front door—evidence consistent with a forced entry. Cullins's body was found partially clothed in the bedroom closet, and her neck bore a ligature mark. The concealment of the body in a closet and the cause of Cullins's death—asphyxia due to strangulation—bore a strong resemblance to the circumstances of the Susan Knoll/Jillette Mills murders in Culver City three days earlier.

Cullins's wallet containing her various items of identification was recovered from a location near where the distinctive Datsun 280 ZX was parked that same week. The wallet also contained Bonnie Guthrie's identification, strongly suggesting that one person had murdered and robbed both women.

On April 13, 1984, a man wearing a dark jacket made a withdrawal from Cullins's bank account. Four days later, in Arizona, a paper bearing the word "SHYLAS," a bank passcard bearing Cullins's name, and a black jacket were among the items found in defendant's possession at the time of his arrest.

The foregoing evidence amply supports the jury's conclusions that late in the evening of April 12, 1984, defendant, with the requisite felonious intent, forced his way into Cullins's apartment, encountered Cullins, compelled her to disclose her bank password, then fatally strangled her, concealed her body in her bedroom closet, took her wallet, and subsequently depleted her bank account. The evidence thus established the elements of the charged offenses—burglary, robbery, and murder—as well as the elements of the burglary and robbery special circumstances.

In reaching our conclusion, we reject defendant's contention that the prosecution failed to establish that defendant acted with felonious intent. Nor do we find persuasive his related contention that the robbery and burglary special-circumstance findings were improper because the crimes were merely incidental to the murder or intended to facilitate or conceal the murder. (See *People v. Zapien* (1993) 4 Cal.4th 929, 984–985 [17 Cal.Rptr.2d 122, 846 P.2d 704].) The requisite intent for each crime, and supporting each of these special circumstances, readily may be inferred from the evidence. (See *People v. Matson* (1974) 13 Cal.3d 35, 41 [117 Cal.Rptr. 664, 528 P.2d 752] ["Although the People must show that a defendant charged with burglary

entered the premises with felonious intent, such intent must usually be inferred from all of the facts and circumstances disclosed by the evidence, rarely being directly provable. [Citations.] When the evidence justifies a reasonable inference of felonious intent, the verdict may not be disturbed on appeal."]; see also *People v. Ochoa, supra,* 19 Cal.4th at pp. 413–414 [In reviewing a claim of insufficient evidence as to special circumstance findings, " ' "we must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the [allegations] beyond a reasonable doubt.' " ' [Citation.]"].)

The requisite intent and all essential elements were present here. Cullins's apartment showed signs of a forced entry consistent with an intent to commit a felony. The evidence that the doorjamb had been pried, producing a scattering of wood chips near the front door, supported the burglary charge and the burglary special circumstance.

The circumstance that defendant harbored an intent to rob Cullins—quite independent of his intent to murder her—may be inferred from the evidence that he obtained her bank account password prior to fatally strangling her. The circumstances of the break-in, murder, robbery, and theft, together with defendant's hurried, loud, and dramatic departure in the stolen vehicle consistent with a perpetrator's escape from a crime scene, amply support the inference of defendant's intent to commit burglary. (*People v. Moody* (1976) 59 Cal.App.3d 357, 363 [131 Cal.Rptr. 923].)

With regard to defendant's contention that the lying-in-wait special circumstance was not supported by substantial evidence, the People contend the evidence adduced at trial suggested that defendant accomplished his entry prior to Cullins's arrival home. The People urge that no other explanation for the forcible entry, indicated by the presence of the wood chips, was adduced at trial, and that it reasonably could be inferred that defendant was lying in wait for his victim from the forced entry, as well as from the presence of Jillette Mills's stolen vehicle, with its engine running for several minutes, at the approximate time Cullins likely returned to her apartment. (See *People v. Hillhouse, supra,* 27 Cal.4th at pp. 500–501; *People v. Michaels* (2002) 28 Cal.4th 486, 516–517.)

We reject the People's position on this point. The evidence in support of the lying-in-wait special circumstance—essentially, the wood chips and the car with its engine running—appears unduly reliant upon the *inference* suggested by the prosecution that defendant arrived *prior to* Cullins's return home in order to attack her *by surprise*. The wood chip evidence tended to show forced entry, not that the entry occurred prior to Cullins's arrival.

Cullins may have arrived at her apartment before defendant did, and he may have forced his way in while she was undressing elsewhere in the apartment. Under the latter scenario, the lying-in-wait special circumstance would rely upon the neighbor who heard the car engine running, and the time of that event cannot be pinpointed. Moreover, the car idling, besides occurring at an uncertain time, does not strongly imply that defendant was waiting in the car to attack Cullins; if defendant had planned a home invasion when Cullins arrived home, he likely would have turned off the engine so as not to attract attention. We therefore set aside the special circumstance of lying in wait.

At the time of defendant's arrest, he was fleeing California in a vehicle that had belonged to murder victim Jillette Mills, and was in possession of personal property that linked him to each one of the murdered women, including the murder victim in the present case. As noted, Janette Cullins's body was concealed in a manner similar to that used to hide the bodies of Susan Knoll and Jillette Mills. Each of these women, and Bonnie Guthrie, had been fatally strangled. No reasonable explanation, other than defendant's culpability for the charged offenses, presented itself at trial. Indeed, the evidence in support of the charged crimes and burglary and robbery special circumstances was overwhelming.[32]

### 3. *The Prior Murder Special Circumstance*

Defendant contends the trial court committed prejudicial error when it denied his motion to strike the prior-murder special-circumstance allegations derived from the murders of Susan Knoll, Jillette Mills, and Bonnie Guthrie, reflected in the Los Angeles County judgment rendered against defendant on January 30, 1990. Defendant challenged the prior convictions on the ground they were "constitutionally defective," because defendant "was denied the right to effective assistance of counsel" and "denied his constitutional right to testify at the guilt phase of the Los Angeles trial; he was erroneously denied his constitutional right to present a defense at the guilt phase of that trial; and the Los Angeles trial court erroneously failed to afford him a hearing on conflict of interest allegations between him and his attorneys, in violation of his right to counsel." Defendant further asserts that "failure to dismiss [the prior murder] special circumstances . . . would deny [him] a fair trial and due process of law . . . and would deny him protection against cruel and unusual punishment" in violation of the applicable state and federal constitutional guarantees.

---

[32] In view of our conclusion that substantial evidence supports defendant's convictions and the burglary and robbery special-circumstance findings, we find no merit in defendant's related contention that the trial court erred in denying his pretrial motion to dismiss the substantive charges and strike those special circumstance allegations. For the same reason, we reject defendant's contention that the trial court erred in denying his motions for judgment of acquittal made during and at the conclusion of the prosecution's case-in-chief.

In the companion case, *People v. Carter, supra,* 36 Cal.4th 1114, we have upheld the judgment of death against defendant for the murders of Susan Knoll, Jillette Mills, and Bonnie Guthrie. In so doing, we have rejected contentions that are substantially similar to those made in support of defendant's motion at the trial of the present case to strike the prior murder special-circumstance allegations—contentions that, by his own acknowledgment, he has included "to a large extent" here. (*Id.* at pp. 1156–1157.) As we have explained in that decision, the Los Angeles County murder convictions were valid, and therefore the San Diego trial court properly denied the motion to strike. Insofar as defendant's arguments regarding the validity of the prior murder convictions forming the basis for the prior murder special circumstance differ from the arguments made in his automatic appeal from the Los Angeles County judgment convicting him of those murders, we reject those arguments.

## C. *Alleged Prosecutorial Misconduct*

Defendant contends the prosecutor committed prejudicial misconduct, requiring reversal of the judgment, based upon the following asserted transgressions: (1) "misstatements of fact and deceptive practices to gain favorable rulings," (2) "comments disparaging of defense counsel," and (3) "prosecutorial misconduct during opening and rebuttal arguments, including adverse comment upon defendant's right against self-incrimination, improper shifting of the burden of proof, and misstatements of law."

 " 'The applicable federal and state standards regarding prosecutorial misconduct are well established. " 'A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." ' " [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves " ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " [Citation.] As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant [requested] an assignment of misconduct and [also] requested that the jury be admonished to disregard the impropriety. [Citation.] Additionally, when the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' (*People* v. *Samayoa* (1997) 15 Cal.4th 795, 841 [64 Cal.Rptr.2d 400, 938 P.2d 2].)" (*People v. Ochoa, supra,* 19 Cal.4th at p. 427; see also *People v. Box, supra,* 23 Cal.4th at pp. 1207–1208 [rejecting claim of prosecutorial misconduct where the defendant "failed to satisfy the general

rule requiring assignment of misconduct and request for admonition as to the prosecutor's comment of which he now complains"].)

Here, defendant failed to request an assignment of misconduct or an admonition with regard to any of the conduct he now challenges as improper. Accordingly, he has not preserved his claims on appeal.

Even assuming defendant's claims properly were before us, we would reject them on the merits, as follows.

### 1. *Alleged Misstatements of Fact and Deceptive Practices*

Defendant contends that prior to trial, the prosecution misled the trial court into believing that a key found in defendant's possession was a key to Barbara S.'s business office. Defendant implies the prosecution acted in bad faith in light of its subsequent disclosure that the key could not be located. No misconduct appears.

Defendant faults the prosecution for declining to stipulate to certain facts supporting defendant's motion to suppress evidence seized from the Datsun 280 ZX. Defendant contends the prosecution's position was characterized by "obfuscation and gamesmanship." The prosecution's reluctance to accept a stipulation was not improper. (See *People v. Garceau* (1993) 6 Cal.4th 140, 182 [24 Cal.Rptr.2d 664, 862 P.2d 664].)

Defendant contends the prosecution misrepresented the significance of the testimony of witness Polly Haisha. Defendant argues that the prosecution on the first day of trial deceptively suggested that Haisha was a potential witness who was unlikely to be called unless the defense denied ownership of the address book that included her name. Defendant also complains that Haisha, a law student, was permitted to remain in the courtroom during a portion of the opening statements, until the defense objected that her presence violated the court's order excluding witnesses from observing the proceedings.

At trial, defendant objected to Haisha's testimony on relevancy grounds, which the trial court properly overruled, as we previously have explained. (See, *ante*, at pp. 1254–1257.) Defendant did not object to Haisha's testimony on the ground that the prosecution had violated discovery rules or had engaged in misconduct. Therefore, he has waived any such claim on appeal. (*People v. Ochoa, supra*, 19 Cal.4th at p. 427.) Even if we assume prosecutorial misconduct, it is not reasonably probable that a result more favorable to defendant would have occurred in the absence of Haisha's testimony. (*People v. Haskett* (1982) 30 Cal.3d 841, 866 [180 Cal.Rptr. 640, 640 P.2d

776].) As we previously have noted, Haisha was a minor witness whose testimony was peripheral to the central events underlying defendant's crime spree. Neither her presence during a portion of the prosecutor's opening statement, in violation of the court's order excluding witnesses, nor her eventual testimony at trial, could have made any possible difference in the outcome of the trial, in view of the compelling evidence that linked defendant to the charged offenses.

### 2. *The Prosecutor's Comments Regarding Defense Counsel*

Defendant contends the prosecution made disparaging comments regarding defense counsel. Again, defendant did not object to the comments of which he now complains, and thereby has waived his claim. (*People v. Gionis* (1995) 9 Cal.4th 1196, 1215 [40 Cal.Rptr.2d 456, 892 P.2d 1199].) Even if defendant's contention properly were before us, we would reject it. With one exception, the comments were not made in the presence of the jury, and defendant fails to demonstrate how these comments outside the jury's presence, which were of the sort one might expect to encounter during a vigorously contested capital trial, prejudiced the proceedings below. With regard to the one comment made before the jury—at the commencement of the prosecution's guilt phase rebuttal argument—we note that it was fleeting, imprecisely attributed to a member of the United States Supreme Court, and not remotely similar in degree of impropriety to the comments we have held to constitute prejudicial misconduct. (See, e.g., *People v. Hill* (1998) 17 Cal.4th 800 [72 Cal.Rptr.2d 656, 952 P.2d 673].)[33]

---

[33] The prosecutor argued on rebuttal as follows:

"Good morning. [Defense counsel] suggested that the prosecution, or law enforcement developed a theory about Dean Carter's guilt and then suggested that perhaps the witnesses changed their testimony to fit that theory. Suggested perhaps that by the way we ask questions and the way we presented evidence, that we were somehow trying to manipulate the evidence to fit a theory about his guilt.

"I suggest to you that would be improper for the prosecution to do.

"[Defense counsel] likes to talk about age[-]old traditions in our system, he likes to talk about the Constitution, and he likes to talk about the rules, so I'm going to do that for a minute.

"I'm going to tell you what a United States Supreme Court [justice]—he likes to do that on occasion, to, quote the United States Supreme Court—said about the relative duties between prosecutors and defense attorneys.

" 'Law enforcement officers have an obligation to convict the guilty and to make sure they do not convict the innocent.'

"It would be improper for the prosecution to try to manipulate a case to convict somebody who wasn't guilty. And if we tried to do that, he wouldn't stand still for it, and the court wouldn't stand still for it.

"That hasn't happened.

"*That same United States Supreme Court Justice says, 'Defense counsel have no comparable obligation to ascertain or present the truth.'*

### 3. *Other Alleged Prosecutorial Misconduct*

Immediately after making the comment noted in the margin (fn. 33, *ante*), the prosecutor commented upon the failure of the defense to present evidence as to "why defendant was in that car with all that property. They could do that if they wanted to."[34] Defendant interposed an objection that the prosecutor improperly was "suggesting that the defendant should have testified, and [is] drawing attention to the fact that he did not." (See *Griffin v. California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229] (*Griffin*).) In view of the arguable ambiguity inherent in the prosecutor's comments, the trial court declined to rule as to their propriety, and instead acceded to defendant's request to reinstruct the jury at that time pursuant to CALJIC Nos. 2.60, and 2.61, which recognized defendant's constitutional right not to testify and his option to rely on the state of the evidence.

On appeal, defendant contends that the prosecutor's comments constituted *Griffin* error. (*People v. Sanders* (1995) 11 Cal.4th 475, 527–529 [46 Cal.Rptr.2d 751, 905 P.2d 420].)

" 'Pursuant to *Griffin*, it is error for a prosecutor to state that certain evidence is uncontradicted or unrefuted when that evidence could not be contradicted or refuted by anyone other than the defendant testifying on his or her own behalf.' (*People v. Hughes* (2002) 27 Cal.4th 287, 371 [116 Cal.Rptr.2d 401, 39 P.3d 432].) We also have said 'it is error for the prosecution to refer to the absence of evidence that only the defendant's testimony could provide.' (*Id.* at p. 372, citing *People v. Murtishaw* (1981) 29 Cal.3d 733, 757 & fn. 19 [175 Cal.Rptr. 738, 631 P.2d 446].) *Griffin*'s prohibition against ' "direct or indirect comment upon the failure of the defendant to take the witness stand," ' however, ' "does not extend to comments on the state of the evidence or on the failure of the defense to introduce material evidence or to call logical witnesses." ' (*People v. Hovey*

---

*"They don't have to tell you what's true. We do."* (Italics added.)

The prosecutor's comments, of which defendant now complains, are derived from *United States v. Wade* (1967) 388 U.S. 218, 256–257 [18 L.Ed.2d 1149, 87 S.Ct. 1926] (conc. & dis. opn. of White, J.).

[34] The prosecutor argued as follows:

"Defense counsel talked a lot about the presumption of innocence. He says you carry that with you into the jury room. I don't want to play a word game. The instruction says, 'The defendant in a criminal action is presumed to be innocent until the contrary is proved.'

"That happened some time ago. The contrary was proved. His innocence was disproved a long time ago in this case. It doesn't exist anymore. The evidence took that away from him.

"The rules are that the defense doesn't have to present any evidence in a case. They can if they want to. No one prevents them from presenting any evidence to you. No one prevents them from telling you what happened. No one prevents them from bringing forth witnesses to explain why the defendant was in that car with all of that property. They could do that if they wanted to."

(1988) 44 Cal.3d 543, 572 [244 Cal.Rptr. 121, 749 P.2d 776], quoting *People v. Jackson* (1980) 28 Cal.3d 264, 304 [168 Cal.Rptr. 603, 618 P.2d 149].)" (*People v. Harrison* (2005) 35 Cal.4th 208, 257 [25 Cal.Rptr.3d 224, 106 P.3d 895]; see also *People v. Stewart* (2004) 33 Cal.4th 425, 505–506 [15 Cal.Rptr.3d 656, 93 P.3d 271]; *People v. Brown* (2003) 31 Cal.4th 518, 554 [3 Cal.Rptr.3d 145, 73 P.3d 1137]; *People v. Bradford* (1997) 15 Cal.4th 1229, 1339 [65 Cal.Rptr.2d 145, 939 P.2d 259].)

In this case, we need not decide whether the prosecutor's comments constituted error under *Griffin*, because even if we assume (without deciding) that error occurred, in view of the indirect nature of the prosecutor's comment, the court's timely reinstruction of the jury, and the strength of the evidence against defendant, it is "clear beyond a reasonable doubt that the jury would have returned a verdict of guilty" (*United States v. Hasting* (1983) 461 U.S. 499, 511 [76 L.Ed.2d 96, 103 S.Ct. 1974]) even if the prosecutor had not made the comment at issue. Accordingly, no prejudicial error occurred.

Defendant also characterizes as improper argument certain additional remarks made by the prosecutor during summation: "There are people among us who murder other people because they like to murder other people. [¶] There are evil people among us. [¶] . . . [¶] [Defense counsel] stresses that you are the conscience of the community, and you are. People in the community have emotions. It's . . . improper for you to have your verdict influenced by emotion. But it is proper for you to express through a verdict how you feel about this case, to tell the defendant Dean Carter, what you did, you murdered Janette Cullins, was evil, was senseless, it was vicious, it was unforgivable, and it was first degree murder." Elsewhere during his summation, the prosecutor argued similarly.

Defendant did not interpose an objection, and thus waived his claim. But even if the issue properly had been preserved, we would reject defendant's claim of error. The prosecutor's comments were not, as defendant asserts, references to "improper[] character propensity," but instead came "within the range of permissible comment regarding egregious conduct on defendant's part. [Citation.]" (*People v. Thomas* (1992) 2 Cal.4th 489, 537 [7 Cal.Rptr.2d 199, 828 P.2d 101] [rejecting a challenge to the prosecutor's characterization of the defendant as a " 'mass murderer, rapist,' " " 'a perverted murderous cancer,' " and a " 'walking depraved cancer' "]; see also *People v. Hawkins* (1995) 10 Cal.4th 920, 961 [42 Cal.Rptr.2d 636, 897 P.2d 574] [upholding prosecutor's characterization of the defendant as " 'coiled like a snake' " and a " 'rabid dog' "].) Moreover, in view of the overwhelming evidence that connected defendant to the charged crimes, the prosecutor's remarks "could not have carried such an emotional impact as to make it likely the jury's

decision was rooted in passion rather than evidence." (*People v. Thomas*, *supra*, 2 Cal.4th at p. 537.)

### D. *Alleged Instructional Error*

Prior to instructing the jury, the trial court reviewed with counsel the instructions to be given. Defendant objected to the trial court giving CALJIC No. 17.20, an instruction that directed the jury to determine whether, if the jury found defendant guilty of robbery and/or burglary, defendant in the commission of those crimes committed great bodily injury on Janette Cullins.[35]

Defense counsel argued: "[T]here [are] all kinds of results that could follow from this. [¶] I don't know if it's a [section] 654 issue or not, but for the [great bodily injury allegation,] if the [great bodily injury] is the killing, and you could have some absurd results in this, one is that, for example, the defendant was found guilty of the robbery and the burglary, and not the murder and then the intentional [great bodily injury,] so I'm wondering if this instruction should be given at all."

The prosecutor responded: "I think [the instruction] should be given. I mean the issue in this case is who did the crime. The same person that robbed her killed her, and counsel expresses the possibility of bizarre results; that they could find him guilty of robbery with the intention of inflicting [great bodily injury], and not the murder. [¶] I can't imagine that happening. I imagine Mr. Carter would be happy as a clam if that happened, but that's not going to happen."

The trial court acknowledged the possibility of "an unexpected result under the facts as we know them," but concluded: "I don't see where it would be prejudicial or confusing to give the instruction." The trial court thereafter

---

[35] Pursuant to CALJIC No. 17.20 (1991 rev.), the trial court instructed the jury as follows:

"It is alleged in Counts Two [robbery] and Three [burglary] that in the commission of the crimes therein described, the defendant, Dean Phillip Carter, with the specific intent to inflict injury, personally inflicted great bodily injury on Janette Ann Cullins.

"If you find the defendant guilty of robbery and or burglary, you must determine whether or not the defendant, with the specific intent to inflict such injury, did personally inflict great bodily injury on Janette Ann Cullins in the commission of robbery and/or burglary.

" 'Great bodily injury' as used in this instruction means a substantial physical injury. Minor or moderate injuries of a temporary nature do not constitute great bodily injury and are not sufficient.

"The People have the burden of proving the truth of this allegation. If you have a reasonable doubt that it is true, you must find it to be not true.

"You will include a special finding on that question in your verdict, using a form that will be supplied for that purpose."

instructed the jury pursuant to CALJIC No. 17.20. Upon returning verdicts of guilty as to robbery and burglary, the jury found "true" the allegations that defendant personally inflicted great bodily injury on Cullins with regard to both of those offenses. The court imposed sentencing enhancements of three years' imprisonment for each of the special allegations, which the court stayed pursuant to section 654.

On appeal, defendant contends the trial court erred in giving the instruction, citing section 12022.7, subdivision (g), which provides that a sentencing enhancement for inflicting great bodily injury "shall not apply to murder or manslaughter." Defendant further contends that reversal of the judgment is required "because as a matter of law criminal sanctions were imposed upon insufficient proof and double punishment is prohibited by law." He also challenges the sufficiency of the evidence in support of the great bodily injury findings.

We reject defendant's argument in all respects. The jury was properly instructed, because the allegations of great bodily injury clearly and specifically enhanced each of the robbery and burglary counts, not the murder count. The jury's verdicts specifically found defendant guilty of robbery and burglary, with a great bodily injury finding enhancing each of those two crimes. Nothing contained in the jury's verdicts or in the record as a whole indicates that the jury misunderstood its function in this regard or was confused by the challenged instruction. With regard to defendant's claim that the evidence was insufficient to sustain the findings as to the enhancements, the fatal strangulation of Janette Cullins provides the evidentiary support for the allegations that in committing the robbery and the burglary, defendant inflicted great bodily injury. The circumstance that the trial court stayed the three-year enhancements that were imposed based upon the jury's findings that defendant inflicted great bodily injury means that defendant was not subject to double punishment. No error appears.[36]

### E. *Miscellaneous Contentions*

Defendant raises a number of contentions that are either virtually identical or substantially similar to certain claims raised on appeal from the Los Angeles County death judgment rendered against him for the murders of Susan Knoll, Jillette Mills, and Bonnie Guthrie—contentions that we have rejected in the companion appeal in *People v. Carter, supra,* 36 Cal.4th 1114. These contentions are as follows: 1) defendant's motion to suppress the

---

[36] The question whether section 654 applies to enhancements is before us in *People v. Palacios* (review granted, May 11, 2005, S132144). Because, as noted in the text, the enhancements imposed here were stayed and defendant therefore was not subject to double punishment, we need not and do not address the section 654 issue here.

evidence seized from his person and from the stolen Datsun 280 ZX improperly was denied; 2) defendant's motion to exclude other-crimes evidence involving the death of Tok Kim, the murders of Susan Knoll, Jillette Mills, and Bonnie Guthrie, and the rape of Jennifer S., improperly was denied; 3) the photographic lineup procedures used by the Oakland Police Department in the investigation of Tok Kim's death in Alameda County were impermissibly suggestive, and therefore the trial court erred in denying the motion to exclude the Alameda County witness identifications of defendant; 4) defendant's motion to exclude the preliminary hearing testimony of Alameda County witness Ray Blevins (who had died prior to trial) improperly was denied; and 5) defendant's motion to sever his trial for the murder of Janette Cullins from the charge of rape involving Barbara S. improperly was denied.[37]

For the reasons we have set forth more extensively in the companion matter, *People v. Carter, supra,* 36 Cal.4th 1114, we reject defendant's contentions. Insofar as defendant's claims do not precisely mirror those set forth in the companion appeal, neither defendant's additional arguments nor the variants in their phrasing persuade us that the trial court committed an error or abuse of discretion prejudicial to defendant's case. Indeed, these claims are not deserving of additional discussion. (*People v. Laursen* (1972) 8 Cal.3d 192, 205 [104 Cal.Rptr. 425, 501 P.2d 1145].)

## IV. *PENALTY PHASE*

### A. *Evidence of Defendant's Sexual Assault on Jennifer S.*

At the conclusion of the People's case in aggravation, the prosecutor, over defendant's objection, offered abstracts of judgment as proof that defendant

---

[37] With regard to defendant's contention that the trial court erroneously denied his motion to sever his trial for the murder of Janette Cullins from the charged rape of Barbara S., we rely upon the analysis of section 954 and our decisions interpreting that statute as set forth in *People v. Carter, supra,* 36 Cal.4th at pages 1153–1154, and which need not be repeated here, except to observe that the distinctions between defendant's motion to sever the Susan Knoll and Jillette Mills murder charges from the Bonnie Guthrie murder charge in the Los Angeles proceedings (see *id.* at pp. 1152–1156), and defendant's motion to sever the Janette Cullins murder charge from the Barbara. S. rape charge in the San Diego proceedings, do not persuade us that the trial court below abused its discretion. To the contrary, the court reviewed in exhaustive detail the basis for its conclusion that severance was improper, observing, among other things, that the rape and murder charges were of the same class under section 954, each crime involved a forced entry into a residence, each involved evidence that a knife had been used, each involved theft, and each victim previously had been acquainted with defendant. Strong evidence linked defendant independently to the death of Janette Cullins and to the rape of Barbara S. Accordingly, the likelihood that the jury might convict defendant of having committed one of the charged crimes based on the evidence that he committed the other was virtually nonexistent. No abuse of discretion in denying defendant's motion to sever appears. Nor has defendant demonstrated that prejudice actually resulted from the joinder of the murder and rape charges at trial. (See *People v. Bradford, supra,* 15 Cal.4th at p. 1318.)

had been convicted of: (1) sexual assault crimes committed against Jennifer S. in Ventura County in March 1984, (2) burglary in Alaska in 1978, and (3) burglary in Oregon in 1974. Defendant argued against the introduction of defendant's Ventura County convictions on the basis that because the judgments were rendered in October 1984, they postdated the April 1984 murder of Janette Cullins and therefore were inadmissible as prior felony convictions under section 190.3, factor (c). (See, e.g., *People v. Webster* (1991) 54 Cal.3d 411, 453 [285 Cal.Rptr. 31, 814 P.2d 1273]; *People v. Balderas* (1985) 41 Cal.3d 144, 201–202 [222 Cal.Rptr. 184, 711 P.2d 480].)

The trial court agreed with defendant's interpretation of the temporal requirements of section 190.3, factor (c), but pursuant to section 190.3, factor (b), correctly recognized that "the evidence of crimes of violence can occur before or after the murder, and the [Jennifer S.] rape is a crime of violence." (See, e.g., *People v. Malone* (1988) 47 Cal.3d 1, 47 [252 Cal.Rptr. 525, 762 P.2d 1249].) The trial court thereafter admitted evidence of defendant's sexual assault upon Jennifer S.

On appeal, defendant reiterates his contention that the trial court improperly admitted this evidence. For the reasons aptly noted by the trial court, no error appears.[38]

Even if the trial court had failed to recognize the distinction between section 190.3, factors (b) and (c), and admitted evidence of defendant's crimes against Jennifer S. under subdivision (c), the error would have been harmless, "because the evidence was admissible as evidence of violent criminal activity under [section 190.3,] factor (b)." (*People v. Bradford, supra,* 15 Cal.4th at p.1374.)

Defendant further contends the trial court improperly instructed the jury that it could double-count the crimes committed against Jennifer S. under section 190.3, factors (b) and (c). His citation to the record, however, is to an inapposite instruction (CALJIC No. 2.82—Concerning Hypothetical Questions), and our review of the other instructions given to the jury has not revealed any such "double-counting" instruction.

B. *Exclusion of Proffered Evidence in Mitigation*

The defense introduced evidence of defendant's troubled childhood while growing up in Alaska. Several witnesses testified that defendant spent considerable portions of his childhood and adolescence in orphanages, juvenile institutions, and foster homes, and was incarcerated in penal institutions during much of his early adulthood.

---

[38] Insofar as defendant's argument can be read to incorporate his pretrial efforts to strike evidence of his sexual assault upon Jennifer S., his claim fails for the same reasons as those noted above.

The trial court rejected the proffered testimony on the ground of relevancy and under Evidence Code section 352, explaining at some length the court's reasoning.[39]

---

[39] The trial court ruled as follows:

". . . I was trying real[ly] hard with [Dr. Ellana] to figure out some way for her to be able to testify before the jury for a variety of reasons. But a number of things came up during the course of this discussion that cause me a great deal of concern in terms of relevance, as well as under [Evidence Code section] 352, getting into her own biases that began to crop up at certain points.

"Now, the areas that I made note that the defense asked questions on had to do with prejudice by Jim Carter, the defendant's father, prejudice in general, in the community of Nome, alcoholism in that area, [']bush kids['] and that phrase, and the negative connotation that goes with it, and the despair. . . .

"[Dr. Ellana] is a very qualified person for her particular occupation, but that doesn't mean that she is automatically an expert who is . . . appropriate for this particular case.

"First of all, foundationally, her testimony concerning Jim Carter relates to a time period when the defendant is probably about 12 years old, give or take a little, at that point. [¶] . . . [¶]

"She has seen the defendant with his father two times, and obviously there was nothing inappropriate that was expressed or seen at that particular stage.

"Her foundation for her opinion about Jim Carter is based upon these staff meetings, is what she said. [¶] . . . [¶]

"[T]here is no showing at this particular stage, that the defendant, himself, was experiencing prejudice on the part of his stepfather, and it is very speculative. I mean I've allowed a lot to come in on this issue of prejudice, and I think the jury is well aware that prejudice exists in Nome now, and it did then. And therefore, the defendant may have been subjected to, and probably was subjected to some of the prejudice. And that, you know, I think ought to be there, and is there, as well as the alcoholism.

"But to allow her to testify as to her opinion as to whether Mr. Carter is prejudice[d] when her own statements about a desire to have native people, you know, employed in the school, and she probably wouldn't have hired him if she had known he was in law enforcement, does not sound to me like we are getting into an area where its truly an expert opinion being expressed. [¶] . . . [¶]

". . . The other comments lead me to believe under [Evidence Code section] 352 we are going to get into a lot of things that are going to be very time-consuming, nonproductive in an area I'm determining at this stage, although relevant, is not compellingly relevant in light of the state that we know about any impact or prejudice on Dean Carter himself.

"In other words, we don't have any psychiatric testimony, and the defendant hasn't testified, and I haven't seen it come in any other way at this particular stage, except perhaps that his mother, not the father, didn't bring him cookies when she brought cookies to the older boy.

"And I think it is necessary to lay the record on this, so I apologize for keeping you, because there is a real balancing that has to be done under [Evidence Code section] 352. The probative value on these particular points, because a good portion of it is duplicative, as well, or cumulative—not just duplicative but cumulative—is also a part of what I'm weighing. [¶] . . . [¶]

" [']Bush kids['] is not relevant at this point. And as far as the despair is concerned, it is purely speculative based upon her particular knowledge of the area at that particular time. . . . I did not get the feeling, based upon the qualifications, that this is where her expertise truly lies.

"So for those reasons, . . . I just want to make it real clear, there is no evidence in terms of how Jim Carter treated Dean Carter directly as a result of any potential prejudice in that regard.

On appeal, defendant contends the trial court erred in excluding the testimony in question. Although certain aspects of Dr. Ellana's testimony clearly fell outside the bounds of relevancy (for example, cultural attitudes and problems in Nome at the time of defendant's 1991 trial, seven years after he was incarcerated in California), and other aspects were cumulative (for example, the harsh living conditions experienced by residents of Nome), the question whether her testimony ought to have been excluded *in its entirety* is closer. Dr. Ellana did have firsthand knowledge of the rigid and prejudicial attitudes regarding "half-breeds" expressed by defendant's stepfather; as noted earlier, defendant is part Eskimo. Consistent with the principles set forth in Evidence Code sections 210 and 352, we believe that the trial court could have set certain limits as to the areas in which Dr. Ellana could testify.

We need not decide whether the trial court's ruling to exclude Dr. Ellana's testimony in its entirety was erroneous, however, because even if we assume that error occurred, defendant suffered no prejudice. The jury heard a considerable amount of other testimony regarding Nome's harsh conditions and defendant's troubled childhood. Viewed in the context of the comprehensive case in mitigation presented by the defense, Dr. Ellana's testimony was of marginal significance and unlikely to have swayed the jury. Defendant fails to persuade us that it is reasonably possible a more favorable result would have been reached in the absence of the trial court's ruling excluding this testimony. (*People v. Brown, supra,* 46 Cal.3d 432, 447–448.)

### 3. *The Proffered Testimony of James W. L. Park*

Outside the presence of the jury, the defense offered the testimony of James W. L. Park, an expert in prison operations, prison construction, and prisoner classification who had lengthy experience working in the California Department of Corrections. Park testified that prisons use audiovisual equipment, and that a prisoner with experience in this field would be a benefit to the prison system. Based upon his review of defendant's records of incarceration, Park stated that in his opinion defendant would make "an above[-] average adjustment" to living in a maximum security prison. Park further testified that defendant "would not be a danger to staff or to prisoners."

The trial court ruled that Park could testify before the jury as to his opinion that defendant would adjust to life in prison, but also that if Park so testified, the prosecution would be permitted to cross-examine Park with regard to

---

"And also the timing of it is a problem. I'm not going to allow it, is the bottom line. [¶] . . . [¶]
"I think the probative value is minimal and the prejudicial effect in terms of getting into issues which are going to create a great deal of confusion in terms of timing and the cumulative effect of bringing her back is just—the probative value is minimal and the prejudicial effect is high, and I'm not going to allow it."

defendant's psychological testing results and history of violence and criminal behavior.[40]

Defense counsel thereafter informed the court that the defense would not call Park as a witness.

On appeal, defendant contends "[t]he trial court's improper ruling effectively precluded the expert's testimony in violation of [defendant's] constitutional rights." We disagree. The proffered testimony sought to introduce into evidence certain experience and character traits of defendant that suggested he would adjust well to prison life and probably would not be dangerous to other inmates and staff. Had the defense introduced that evidence, the prosecution would have been entitled to cross-examine Park regarding defendant's psychological propensities and prior criminal record. (See *People v. Daniels* (1991) 52 Cal.3d 815, 882–883 [277 Cal.Rptr. 122, 802 P.2d 906].) The trial court did not preclude Park from testifying, nor unduly restrict the areas of inquiry pertaining to his proposed testimony, but instead simply made clear that if the defense offered evidence of defendant's character related to the likelihood of his adjustment to life in prison, the prosecution would be entitled to cross-examine the witness and seek to rebut his testimony. Under these circumstances, the defense for obvious tactical reasons declined to introduce Park's testimony. No error or abuse of discretion appears.

### 4. *The Trial Court's Ruling Prohibiting Allocution*

Although acknowledging that the right of allocution is not recognized in California, defendant nevertheless contends the trial court erred in refusing his request to plead for mercy without being subject to cross-examination. No error appears. (See, e.g., *People v. Davenport* (1995) 11 Cal.4th 1171, 1209 [47 Cal.Rptr.2d 800, 906 P.2d 1068]; *People v. Hunter* (1989) 49 Cal.3d 957, 989 [264 Cal.Rptr. 367, 782 P.2d 608].)

---

[40] The trial court's ruling included the following:

"[Defendant's] status as a death row inmate will not come in.

". . . [Park] may not testify to what it's like to be . . . a prisoner under a life without possibility of parole [LWOP] sentence in and of itself. . . .

"He may testify that based upon his experience, that an LWOP prisoner could utilize a trade as a video operator.

"He will be allowed to testify as to his opinion that the defendant will make an adequate adjustment to state prison, but if that question is asked, the People may cross-examine him, including cross-examining him on his history of any violence or any criminal behavior. [¶] . . . [¶]

"And [defendant's] entire record, and any psychological testing results that the people have can be raised by way of cross-examination of this particular witness, because that's information that that witness should have in forming such an opinion.

"[The People] also [will] be allowed to cross-examine the witness and make it clear to the jury that this witness has not examined this defendant."

C. *Alleged Prosecutorial Misconduct*

Defendant contends the prosecution committed misconduct at the penalty phase by "propound[ing] questions to witnesses in bad faith," interposing objections on the ground of hearsay, propounding "arguments . . . designed to improperly invoke non-statutory aggravation evidence in violation of [s]ection 190.3 and [defendant's] constitutional rights," and by improperly commenting upon defendant's failure to testify in violation of *Griffin v. California, supra,* 380 U.S. 609. Defendant further contends the prosecution improperly "used every means available to curtail testimony regarding [defendant's] child-hood—or other—socio-medico information and history that were legitimately proffered for a sentence less than death."

Our review of the record leads us to conclude that defendant greatly overstates his position. Although a prosecutor is not permitted to comment, "either directly or indirectly, on the defendant's failure to testify in his defense," the prosecutor may comment " 'on the state of the evidence, or on the failure of the defense to introduce material evidence or call logical witnesses.' " (*People v. Turner* (2004) 34 Cal.4th 406, 419 [20 Cal.Rptr.3d 182, 99 P.3d 505], quoting *People v. Medina, supra,* 11 Cal.4th at p. 755.) For the most part, the prosecution's handling of its penalty phase responsibilities fell within the range of appropriate behavior. The prosecution was vigorous in its cross-examination and summation, and in interposing objections (most of which clearly were well-founded). Even were we to assume that the isolated incidents of which defendant now complains constituted misconduct, they were trivial in the context of defendant's trial and did not resemble or even approach the sort of misconduct that we have held to be prejudicial. (See, e.g., *People v. Hill, supra,* 17 Cal.4th 800.) We therefore reject defendant's claim of prejudicial error.[41]

D. *Miscellaneous Contentions*

Defendant raises a number of contentions that are virtually identical or substantially similar to claims raised on appeal from the Los Angeles County death judgment rendered against him for the murders of Susan Knoll, Jillette Mills, and Bonnie Guthrie, and which we have rejected in the companion case of *People v. Carter, supra,* 36 Cal.4th 1114. These contentions are as follows: 1) the trial court's pattern jury instructions to the jury were inappropriate; 2) the delay between the pronouncement of defendant's death sentence and his execution renders the entire process unconstitutional; and 3) the use of lethal gas as a method of execution is unconstitutional.

For the reasons we have set forth more extensively in the companion matter, *People v. Carter, supra,* 36 Cal.4th at pages 1201–1214, we reject

---

[41] We also reject as meritless defendant's assertions of prosecutorial misconduct to the extent that they relate to alleged instances of misconduct during voir dire, which defendant addresses in connection with his penalty phase argument.

defendant's contentions. Insofar as defendant's claims do not precisely mirror those set forth in the companion appeal, neither defendant's additional arguments nor the variants in their phrasing persuade us that the trial court committed an error or abuse of discretion prejudicial to defendant's case. Indeed, these contentions are not deserving of additional discussion. (*People v. Laursen*, *supra*, 8 Cal.3d at p. 205.)

### E. *Challenges to the Death Penalty Law*

Defendant contends that many features of California's capital sentencing scheme, singly and in combination, violate the federal Constitution. We previously have rejected similar challenges, and because defendant has not presented any persuasive reason for us to reconsider those rulings, we decline to do so.

 The 1978 death penalty law does not violate the Eighth Amendment by failing to distinguish between death-eligible and non-death-eligible murders in a meaningful and nonarbitrary way. (See, e.g., *People v. Combs*, *supra*, 34 Cal.4th 821, 868; *People v. Morrison* (2004) 34 Cal.4th 698, 729 [21 Cal.Rptr.3d 682, 101 P.3d 568]; *People v. San Nicolas* (2004) 34 Cal.4th 614, 676–677 [21 Cal.Rptr.3d 612, 101 P.3d 509]; *People v. Burgener* (2003) 29 Cal.4th 833, 884 & fn. 7 [129 Cal.Rptr.2d 747, 62 P.3d 1]; *People v. Barnett* (1998) 17 Cal.4th 1044, 1179 [74 Cal.Rptr.2d 121, 954 P.2d 384]; *People v. Jones* (1997) 15 Cal.4th 119, 196 [61 Cal.Rptr.2d 386, 931 P.2d 960]; *People v. Sanchez* (1995) 12 Cal.4th 1, 60–61 [47 Cal.Rptr.2d 843, 906 P.2d 1129]; *People v. Stanley* (1995) 10 Cal.4th 764, 842–843 [42 Cal.Rptr.2d 543, 897 P.2d 481].) The special circumstances set forth in the statute are not overinclusive by their number or by their terms, nor have these categories been construed in an overly inclusive manner. (*People v. Ray* (1996) 13 Cal.4th 313, 356 [52 Cal.Rptr.2d 296, 914 P.2d 846].)

 Section 190.3, factor (a) does not bias the determination of penalty in favor of death, in violation of the Eighth Amendment, as defendant acknowledges.[42] (See *People v. Duncan* (1991) 53 Cal.3d 955, 978–979 [281 Cal.Rptr. 273, 810 P.2d 131]; *People v. Murtishaw* (1989) 48 Cal.3d 1001, 1020 [258 Cal.Rptr. 821, 773 P.2d 172].)

 The use in section 190.3, factor (d) of the adjective "extreme" does not act as a barrier to the jury's proper consideration of defendant's evidence

---

[42] Section 190.3 provides in relevant part:

"In determining the penalty, the trier of fact shall take into account any of the following factors if relevant: [¶] (a) The circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true pursuant to Section 190.1."

in mitigation.[43] (See *People v. Morrison, supra,* 34 Cal.4th 698, 729.) Nor was it reasonably probable that, because of factor (d), the jury failed properly to weigh defendant's evidence in mitigation. To the contrary, we observe that the trial court in the instant case instructed the jury pursuant to section 190.3, factor (k) (factor (k)) as reflected in CALJIC No. 8.85, which provided the jury wide latitude to consider *any* extenuating circumstance in determining penalty.[44] (See *People v. Holt, supra,* 15 Cal.4th at p. 698 [upholding the validity of factor (d), in view of factor (k)]; *People v. Benson* (1990) 52 Cal.3d 754, 804 [276 Cal.Rptr. 827, 802 P.2d 330] ["[T]here is no reasonable likelihood that the jury would have inferred from [CALJIC No. 8.85 (k)] that they could not consider mental or emotional disturbance *of any degree whatever* in mitigation of penalty"].)

Notwithstanding defendant's assertion that the factor (k) instruction is the least accurately understood of California's sentencing factors, contributing to "pronounced" "constitutional harm," we repeatedly have rejected challenges to its validity. (See, e.g., *People v. San Nicolas, supra,* 34 Cal.4th at pp. 675–676; see also *Boyde v. California* (1990) 494 U.S. 370, 381 [108 L.Ed.2d 316, 110 S.Ct. 1190] [upholding a predecessor version of factor (k)].) We do so again here. We also observe that defendant does not demonstrate that the jury misunderstood its function in the present case.

CALJIC No. 8.88 (1989 rev.) is not inconsistent with the requirement set forth in section 190.3 that "If the trier of fact determines that the mitigating circumstances outweigh the aggravating circumstances[,] the trier of fact shall impose a sentence of confinement in state prison for a term of life without the possibility of parole."[45] (See *People v. McPeters* (1992) 2 Cal.4th 1148, 1194 [9 Cal.Rptr.2d 834, 832 P.2d 146] [rejecting a similar contention].)

---

[43] Under factor (d), the trier of fact may, in determining the penalty to be imposed, take into account "[w]hether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance."

[44] Pursuant to CALJIC No. 8.85, the trial court instructed the jury: "In determining which penalty is to be imposed on the defendant, you shall consider all of the evidence which has been received during any part of the trial of this case, except as you may be hereafter instructed. You shall consider, take into account and be guided by the following factors, if applicable: [¶] . . . [¶] (k) Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character, background, social history or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial. . . . "

[45] Pursuant to CALJIC No. 8.80 (1989 rev.), the trial court instructed the jury: "To return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole."

The trial court did not err in failing to instruct the jury (or otherwise require) that the jury must agree unanimously as to aggravating circumstances, that all aggravating factors must be proved beyond a reasonable doubt, that aggravation must outweigh mitigation beyond a reasonable doubt, and that death must be found to be the appropriate penalty beyond a reasonable doubt. (*People v. Carpenter, supra*, 15 Cal.4th at p. 421; *People v. Berryman* (1993) 6 Cal.4th 1048, 1101–1102 [25 Cal.Rptr.2d 867, 864 P.2d 40].)

The trial court's failure to delete inapplicable factors from the instructions given to the jury did not violate defendant's rights under the Fifth, Sixth, Eighth, or Fourteenth Amendments. (*People v. Carpenter, supra*, 15 Cal.4th at p. 421.) Moreover, as defendant acknowledges, the trial court instructed the jury pursuant to CALJIC No. 8.85 that "only those factors that are applicable on the evidence adduced at trial are to be taken into account in the penalty determination in the individual case." We therefore reject defendant's contention that he was deprived of his right to an individualized sentencing determination based upon permissible factors relating to him and the crimes he committed.

The circumstance that under California law an individual prosecutor has discretion whether to seek the death penalty in a particular case did not deny defendant his constitutional rights to equal protection of the laws or to due process of law. (*People v. Barnett, supra*, 17 Cal.4th 1044, 1179; *People v. Ray, supra*, 13 Cal.4th 313, 359; *People v. Crittenden* (1994) 9 Cal.4th 83, 152 [36 Cal.Rptr.2d 474, 885 P.2d 887]; see also *Gregg v. Georgia* (1976) 428 U.S. 153, 225 [49 L.Ed.2d 859, 96 S.Ct. 2909] (conc. opn. of White, J.) ["Absent facts to the contrary, it cannot be assumed that prosecutors will be motivated in their charging decision by factors other than the strength of their case and the likelihood that a jury would impose the death penalty if it convicts."].) Moreover, nothing in the present case even remotely suggests that defendant's constitutional rights were denied by the decision of the San Diego County prosecutor to seek the death penalty. To the contrary, the evidence of defendant's penchant for overpowering young women and strangling them to death amply demonstrates that the prosecutor's decision to seek the death penalty was neither arbitrary nor capricious, but rather an appropriate exercise of prosecutorial discretion in response to defendant's criminal rampage across California. Defendant, an apparently unremorseful serial killer and rapist, is precisely the type of individual against whom virtually any California prosecutor would seek the death penalty. Defendant is totally unconvincing in suggesting otherwise.

### F. Cumulative Error

Defendant contends that the cumulative effect of the asserted errors committed at his trial led to a miscarriage of justice, requiring reversal of the guilt and penalty phase judgments. Having determined that defendant's trial was nearly free of error, and that, to the extent error was committed, it clearly was harmless, we conclude that defendant's claim of cumulative error lacks merit.

## DISPOSITION

The special circumstance of lying in wait is set aside. In all other respects, we affirm the judgment as to both guilt and penalty.

Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Moreno, J, concurred.

**KENNARD, J.**—I concur in the majority opinion, which I have signed. I write separately to address the merits of defendant's claim that the prosecutor improperly commented on defendant's invocation of his right not to testify at trial.

Defendant was charged with the murder of Janette Cullins. In its case-in-chief, the prosecution presented evidence that defendant had also murdered four other women: Tok Kim, Susan Knoll, Jillette Mills, and Bonnie Guthrie. When defendant was arrested for the murders, he was driving a car belonging to murder victim Mills. In the car, the police found a key ring that belonged to victim Cullins; a kitchen knife, rubber gloves, and a gold chain, belonging to victim Kim; a supermarket CASHEX card that belonged to victim Knoll; towels, athletic wear, and photographic equipment that belonged to victim Mills; and three handwoven sweaters that belonged to victim Guthrie.

In his rebuttal argument to the jury, the prosecutor said: "No one prevents [the defense] from telling you what happened. No one prevents them from bringing forth witnesses to explain why the defendant was in the car with all that property. They could do that if they wanted to." Defense counsel objected, asserting the prosecutor was in essence commenting on defendant's invocation of the privilege against self-incrimination. Without ruling on the objection, the trial court instructed the jury that defendant had a constitutional right not to testify.

The majority does not decide whether the prosecutor's comment was proper, concluding that any error was harmless. (Maj. opn., *ante*, at pp. 1266–1267.) In my view, the comment violated the rule established in *Griffin v. California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229].

There, the United States Supreme Court held that a prosecutor who comments on a defendant's failure to testify at trial violates the defendant's privilege against self-incrimination, as protected by the Fifth and Fourteenth Amendments to the federal Constitution. The court explained that such a comment "solemnizes the silence of the accused into evidence against him," and thus "cuts down on the privilege by making its assertion costly." (*Id.* at p. 614; see also *Portuondo v. Agard* (2000) 529 U.S. 61, 65 [146 L.Ed.2d 47, 120 S.Ct. 1119].)

This court has explained that, as a general rule, *Griffin v. California, supra,* 380 U.S. 609, does not prevent prosecutors from commenting on the failure of the defense to introduce relevant evidence or to call logical witnesses. (*People v. Hovey* (1988) 44 Cal.3d 543, 572 [244 Cal.Rptr. 121, 749 P.2d 776].) But *Griffin* does not allow a prosecutor to argue to the jury "that certain testimony or evidence is uncontradicted, if such contradiction or denial could be provided *only* by the defendant, who therefore would be required to take the witness stand." (*People v. Bradford* (1997) 15 Cal.4th 1229, 1339 [65 Cal.Rptr.2d 145, 939 P.2d 259]; see also *People v. Johnson* (1992) 3 Cal.4th 1183, 1229 [14 Cal.Rptr.2d 702, 842 P.2d 1] ["a prosecutor errs by referring to evidence as 'uncontradicted' when the defendant, who elects not to testify, is the only person who could have refuted it"]; *People v. Murtishaw* (1981) 29 Cal.3d 733, 757–758 [175 Cal.Rptr. 738, 631 P.2d 446].) Similarly, "a prosecutor may not comment on a defendant's failure to present evidence to contradict the government's case if 'the defendant alone had the information to do so.' " (*U.S. v. Triplett* (8th Cir. 1999) 195 F.3d 990, 995.) To determine whether a prosecutor's comment violated *Griffin,* a reviewing court must decide whether there is a "reasonable likelihood" that the jury construed the remark as a commentary on the defendant's failure to testify. (*People v. Roybal* (1998) 19 Cal.4th 481, 514 [79 Cal.Rptr.2d 487, 966 P.2d 521]; *People v. Clair* (1992) 2 Cal.4th 629, 663 [7 Cal.Rptr.2d 564, 828 P.2d 705].)

Here, the evidence presented to the jury at trial did not disclose the existence of any living person other than defendant who could have testified as to how defendant had acquired a car that belonged to one of the murder victims and that contained property belonging to each of the other murder victims. Nor would there necessarily be such a person if defendant were innocent of the murders. Thus, there is a "reasonable likelihood" (*People v. Roybal, supra,* 19 Cal.4th at p. 514; *People v. Clair, supra,* 2 Cal.4th at p. 663) that the prosecutor's assertion that nothing prevented the defense from "bringing forth witnesses to explain why the defendant was in the car with all that property" was construed by the jury as a commentary on defendant's failure to testify in his own defense.

The prosecutor's improper comment does not, however, require reversal of the judgment. As the majority correctly explains, any error was harmless "in view of the indirect nature of the prosecutor's comment, the court's timely reinstruction of the jury, and the strength of the evidence against defendant." (Maj. opn., *ante*, at p. 1267.) Thus, it is "clear beyond a reasonable doubt that the jury would have returned a verdict of guilty" (*United States v. Hasting* (1983) 461 U.S. 499, 511 [76 L.Ed.2d 96, 103 S.Ct. 1974]) even if the prosecutor had not made the comment at issue.

Appellant's petition for a rehearing was denied October 26, 2005, and the opinion was modified to read as printed above.